ARGUS INCORPORATED and
Interphoto Corporation,
Plaintiffs,

v.

EASTMAN KODAK COMPANY, et
al., Defendants.

No. 79 Civ. 4525 (MP).

United States District Court,
S.D. New York.

June 27, 1985.

**906**

O'Connor & Hannan by Myles J. Ambrose, Washington, D.C., for plaintiff Argus Inc.

Marchi Jaffe Cohen Crystal Rosner & Katz by Ernest Allen Cohen, David R. Taxin, David Jaffe, New York City, for plaintiff Interphoto Corp.

Sullivan & Cromwell by Robert MacCrate, John L. Warden, William L. Farris, Marcy Engel, New York City, for defendant Eastman Kodak Co.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MILTON POLLACK, Senior District Judge.

This is an antitrust suit for violation of § 1 of the Sherman Act, claiming damages pursuant to § 4 of the Clayton Act for alleged injuries to the business or properties of the plaintiffs, Argus Incorporated and Interphoto Corporation.

The defendant, Eastman Kodak Company, has moved for summary judgment dismissing the amended complaint. Kodak contends that: 1) neither plaintiff has standing to sue under § 4 because neither plaintiff is a "person injured in his business or property by reason of anything forbidden in the antitrust laws"; 2) neither plaintiff was engaged in the business—i.e., the camera manufacturing market—that was directly affected by the antitrust violation relied on; 3) neither plaintiff suffered an injury that was proximately caused by the antitrust violation asserted; and 4) neither plaintiff has presented evidence of damages that is sufficiently probative to be submitted to a jury.

In opposition to the defendant's motion, the plaintiffs have submitted 25 affidavits, 11 statements taken under Rule 26(b)(4), a Rule 3(g) statement sworn to by the President of Interphoto, Daniel A. Porco, 12 depositions, answers to interrogatories, all documents identified by both parties in their proposed pretrial orders, and the testimony of 18 witnesses. Many arguments have been briefed.

For reasons that appear below, the plaintiffs' claims will be dismissed because neither plaintiff has shown, by specific probative evidence, the existence of standing to sue or a proximate causal link between the violation and the alleged injuries. Even if plaintiffs had established standing to sue and proximate causation and were permitted to proceed to trial before a jury, most of their damage claims would have to be excised; the scope of cognizable damages would be limited to *de minimis* claims.

## I.  BACKGROUND

On April 10, 1975, Kodak and General Electric Company announced a new flash product, the flipflash, and a compatible new amateur pocket camera. These were technical advances over the 110 Pocket Cameras using magicubes to take flash pictures. Flipflash was a unique lighting system that moved the flash away from the lens center so that it eliminated the problem known as "red-eye" (i.e., red dots in the eyes of the photographed subject). Flipflash also used a unique method to ignite the flash lamp, the "piezo crystal system." Flipflash was developed over a period of years by General Electric Company and Kodak, in a joint development project. General Electric agreed, at Kodak's request, not to disclose flipflash to other camera manufacturers before the completion of the project and simultaneous public announcement of the flipflash and the Kodak cameras designed to use it.

Immediately upon announcement of the flipflash, Interphoto, a wholesale distributor of photographic equipment, set out to find a camera capable of incorporating a

flipflash lighting arrangement; it looked to W. Haking Enterprises Ltd., a large Hong Kong camera manufacturer second in size to Kodak, which manufactures and sells cameras throughout the world. Haking had the capabilities necessary to turn out a flipflash camera promptly.

In May, 1975, Interphoto decided to buy a flipflash camera designed and offered for sale by Haking. Haking undertook to manufacture and sell the desired camera to Interphoto and to label it with the "Argus" name. (Argus previously had licensed Interphoto to use its trademark.) On July 16, 1975, Interphoto placed an order for 50,000 flipflash units, and Haking accepted the order on August 14, 1975. The delivery schedule called for a total of 28,000 units to be delivered in September, October, and November, in time for the Christmas retail season, with the remainder to be delivered in December through the following February. The price of the camera to Interphoto was $6.20; Interphoto's gross markup of 40% per unit was $2.48. In order to produce the camera, Haking had to change its existing tooling but was able to do so quickly. Haking also manufactured and sold flipflash cameras to other customers, each of whom labelled the product with its own brand name.

Due to production delays, the flipflash cameras on the July 16th order arrived in October and November, 1975; 18,000 of the 28,000 expected were delivered and all were sold. Before the end of 1975, Interphoto received 10,000 additional flipflash cameras under an order placed on August 11, 1975.

During 1975, no one other than Kodak had substantial quantities of flipflash cameras. Consequently, camera dealers sold conventional cameras at a lower price.

By February, 1976, the cameras were readily available to Haking's customers, including Interphoto. By that time, ample quantities of the flipflash camera were in the market, and from then on there was no shortage of the cameras. Interphoto bought and distributed flipflash cameras thereafter, for years.

Interphoto claims that the unavailability of flipflash cameras during the 1975 Christmas selling season triggered an irreversible decline in its entire wholesale distribution business, causing it to cease operations in 1980. Argus claims that Interphoto's inability to sell Argus products cost Argus lost royalty payments.

II. CLAIMS

Plaintiffs base their claim of an antitrust violation solely on the determination in *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980), that the secrecy agreement between General Electric and Kodak during the development of the flipflash unreasonably restrained competition in the manufacturing of amateur still cameras. The secrecy agreement gave Kodak a head start over other manufacturers after April 10, 1975 in offering a flipflash camera. The Second Circuit held that the jury could "consider whether Kodak's refusal to permit ... GE to disclose [its] inventions to other camera manufacturers was unreasonable." 603 F.2d at 304. *Berkey* was given collateral estoppel effect in this case. *See Argus Inc. v. Eastman Kodak Co.*, 552 F.Supp. 589 (S.D.N.Y.1982) (Gagliardi, J.). The parties have stipulated that "no recovery shall be had for any damages sustained prior to April 10, 1975."[1]

---

1. The parties also stipulated to the following: "D. Plaintiffs have waived all claims other than their claim against Eastman Kodak Company for damages sustained by reason of the Flipflash Agreement." ... "I. Plaintiffs have waived any contention that any Kodak agreement with General Electric Company restrained or delayed the commercial introduction of Flipflash and shall not advance that contention at trial by evidence or argument." ...

"J. Plaintiffs' claim for relief is based solely on the secrecy of the Flipflash development, and the Court's present determination on collateral estoppel precludes Kodak from seeking to justify on commercial grounds the obtaining from General Electric of a commitment not to disclose the Flipflash prior to its introduction." ...

Argus has elected to present only a single damage claim, sustained after April 10, 1975; it claims $3,450,000 of "lost" trademark royalties on "expected" *Interphoto* sales of the *entire* line of Argus-brand products for the ten-year period 1975–1985. Argus does not present any claims for its lost sales or inventory made obsolete; its claim is wholly derivative of Interphoto's damage claim.

Interphoto presents a single damage claim of $53,475,000 for ten years of "lost" profits on "expected" sales of its *entire* line of photographic and non-photographic products. Interphoto contends that the flipflash secrecy agreement caused "direct damage" to its 126 and 110 camera sales and "indirect damage" to "expected" sales of the other products it distributed, or could have distributed, during the next ten years. Interphoto does not segregate its damages for lost camera sales; instead, it makes a global claim for lost sales of all photographic products. In short, Interphoto claims that its inability to offer flipflash—compatible pocket cameras as a "lead line" to its retail customers during the 1975 Christmas selling season started a chain reaction which caused it to go out of business five years later, in 1980.

Kodak contends that only firms that had invested in manufacturing 110 cameras using magicubes can assert the violation found in *Berkey* and claim damages compensible under Section 4 of the Clayton Act. It asserts that the plaintiffs' claims have nothing to do with camera manufacturing and that the violation found in *Berkey* had at most an indirect impact on plaintiffs' distribution and licensing businesses.

## III. STANDARD FOR DECISION

This case is before the Court on Kodak's motion for summary judgment. Although the Supreme Court has counseled that "[s]ummary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles," *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), it has recognized that summary adjudication can have a significant role in antitrust litigation. As the Court stated in *First Nat'l Bank v. Cities Service*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968),

> "While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint."

The Advisory Committee for the Federal Rules has stated that "The mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for a trial." To serve that purpose, a Court may use summary procedures to assay the alleged probative evidence of the plaintiffs in order to narrow the controverted issues to triable matters and to dispose of matters unsupported by admissible evidence. Rule 43(e), Fed.R.Civ.P., which authorizes the use of oral testimony on motions, is applicable to motions for summary judgment. *See State of Utah v. Marsh*, 740 F.2d 799, 801 n. 2 (10th Cir.1984).[2]

2. "Although Fed.R.Civ.P. 56 is silent on the point, Rule 43(e), which authorizes the use of oral testimony on motions generally, has been held to be applicable to motions for summary judgment." *Marsh*, 740 F.2d at 801 n. 2. *See also* 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2723, at 61 (2d ed. 1983) ("Rule 43(e), which authorizes the use of oral testimony on motions, has been held applicable to motions for summary judgment, even though Rule 56 is silent on the point."); 5 *Moore's Federal Practice* ¶ 43.13 (2d ed. 1984); *County of*

*Oakland v. City of Berkley*, 742 F.2d 289 (6th Cir.1984); *McGuire v. Columbia Broadcasting System, Inc.*, 399 F.2d 902, 907 (9th Cir.1968); *Burham Chemical Co. v. Borax Consolidated, Ltd.*, 170 F.2d 569 (9th Cir.1948); *Weber v. George Cook, Ltd.*, 563 F.Supp. 598 (S.D.N.Y. 1983); *Williams v. City and County of San Francisco*, 483 F.Supp. 335, 338–39 (N.D.Cal.1979); *INA Aviation Corp. v. United States*, 468 F.Supp. 695 (E.D.N.Y.1979); *Hazelgrove v. Ford Motor Co.*, 428 F.Supp. 1096, 1100–01 (E.D.Va.1976).

The instant litigation presents a model for such treatment in light of the substantial discovery which has been had. *In limine* consideration of expert testimony and other evidentiary issues is far more efficient than deferring them until trial. In examining expert opinion *in limine,* the Court may consider the underlying assumptions, inferences drawn, and conclusions reached in order to determine whether the opinion would help the trier of fact to understand the evidence or determine the fact in issue.

The Court ordered a hearing to assay plaintiffs' evidence on the issues of standing to sue, proximate cause, and damages flowing from the antitrust violation. At the hearing, Kodak introduced a broad array of extrajudicial statements made by plaintiffs which appeared both in documents filed publicly pursuant to the requirements of law and in internal corporate minutes and records. Many of these statements were prepared by witnesses who gave oral testimony at variance with the documents.

■ The published and recorded extrajudicial statements are legal admissions. *See* 4 *Wigmore on Evidence* §§ 1048, 1057a (3d ed. 1940). *Cf. Student Public Interest Research Group v. Fritzsche, Dodge & Olcott, Inc.,* 579 F.Supp. 1528, 1538 (D.N.J. 1984). Once such statements were made part of the record, "the burden shifted to [respondents] to come forward with evidence disproving the correctness of th[e] report[s] or explaining error and mistakes in preparation of [them]." *United States v. Maritime Investment Corp.,* 465 F.2d 434, 436 (5th Cir.1972).

■ The burden is not met by contradictory oral statements or speculations that are "unaccompanied by any direct evidence of reporting inaccuracies." *Student Public Interest Research Group,* 579 F.Supp. at 1538. Nor can plaintiffs rely on the conclusory statements of its corporate officers or competitors. "When the fact of injury is in issue, the 'isolated self-serving' evidence of plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely." *H & B Equipment Co. v. International Harvester,* 577 F.2d 239, 247 (5th Cir.1978). *See also Yoder Bros, Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1371 & n. 25 (5th Cir.1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977) (conclusory statements of plaintiff's officers do not constitute substantial evidence). To defeat a motion for summary judgment, the respondent must adduce "factual material which raises a substantial question of the veracity or completeness of the movant's showing or presents countervailing facts." *Beal v. Lindsay,* 468 F.2d 287, 291 (2d Cir.1972) (Friendly, J.).[3]

As described in greater detail below, plaintiffs have not raised any genuine issue of material fact by acceptable factual evidence that contradicts or varies the documentary proof. Plaintiffs presented no probative evidence raising a substantial question about, or casting doubt upon, the veracity or completeness of the public documents, reports, and corporate minutes.

## IV. STANDING

### A) *Contentions*

Kodak contends that *Berkey* holds that the flipflash conspiracy was an unreasonable restraint of competition only in the manufacturing of amateur still cameras. Since plaintiffs rely on *Berkey* to establish the antitrust violation, Kodak contends that plaintiffs must allege an injury to their manufacturing of cameras, not some other injury which the *Berkey* court did not address. Kodak asserts that "plaintiffs abandon th[e *Berkey* ] framework and adopt a wholly different one in advancing Interphoto's claim for lost sales as a 'full line' photographic distributor and Argus's deriv-

---

**3.** In recent cases the Second Circuit has ruled that "mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion," *Quarles v. GMC (Motors Holding Div.),* 758 F.2d 839, 840 (2d Cir.1985); and that "the opposing party may not rest upon mere conclusory allegations or denials," *Schering Corp. v. Home Insurance Co.,* 712 F.2d 4, 9 (2d Cir.1983).

ative claim for lost trademark royalties on Interphoto's sale of a broad and undefined group of 'Argus' products."

Plaintiffs contend that they have standing since they "competed with Kodak in the production and distribution of pocket cameras" and "were within the area of the economy endangered by the breakdown of competitive conditions caused by the flip-flash conspiracy." Plaintiffs further contend that it is immaterial whether Interphoto was a manufacturer "since the flipflash conspiracy gave Kodak an illegal competitive advantage in the sale of its pocket cameras over Interphoto and other distributors competing with Kodak for sales to retailers of pocket cameras."

### B. *The Applicable Law*

Section 4 of the Clayton Act, 15 U.S.C. § 15, states, in pertinent part, that:

"[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ..."

The Supreme Court has held that by this statutory language, "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 892 n. 14, 31 L.Ed.2d 184 (1972). "It is common ground that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." *Associated General Contractors of Calif., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 536, 103 S.Ct. 897, 908, 74 L.Ed.2d 723 (1983).

The Supreme Court has likened the inquiry on standing to sue to the "proximate cause" analysis in torts. *See id.* at 535, 103 S.Ct. at 907; *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 477–78 n. 13, 102 S.Ct. 2540, 2547–48 n. 13, 73 L.Ed.2d 149 (1982). Accordingly, it has "identif[ied] factors that circumscribe and guide the exercise of judgment in deciding whether the law affords a remedy in specific circumstances." *Associated General,*

459 U.S. at 537, 103 S.Ct. at 908. Factors precluding the right to sue under antitrust laws are the indirectness of the asserted injury, the speculative nature of the damage theory, the risk of duplicative recoveries, and the danger of complex apportionment. *See id.* at 538–45, 103 S.Ct. at 909–12; *Triple M Roofing Corp. v. Tremco*, 753 F.2d 242 (2d Cir.1985).

In *Associated General*, the plaintiffs, two Unions, alleged that an association of employers had illegally restrained trade by coercing third parties and some union members to enter into contracts with nonunion contractors. The Court held that the Unions lacked standing, in part because the Unions were "neither a participant in the market ... nor a direct victim of the defendants' coercive practices." *Associated General*, 459 U.S. at 540 n. 44, 103 S.Ct. at 910 n. 44.

The Court noted that other potential plaintiffs, the "immediate victims of coercion" were "an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement" and said that this "diminishe[d] the justification for allowing a more remote party such as the Union to perform the office of a private attorney general." *Id.* at 542, 103 S.Ct. at 911. If the Unions were allowed to recover, the courts "would face problems of identifying damages and apportioning them among directly victimized contractors and subcontractors and indirectly affected employees and union entities." *Id.* at 545, 103 S.Ct. at 912.

By contrast, in *Blue Shield* the Court granted standing based on a more direct link between injury and violation and the absence of countervailing considerations. In *Blue Shield*, the plaintiff was a subscriber to a group health plan that reimbursed members for services provided by psychiatrists but not for those provided by psychologists. Plaintiff, who had been treated by a psychologist, alleged that the bar against compensation to psychologists was a group boycott that violated the Sherman Act § 1.

The Court held that the subscriber had standing because there was a "physical and economic nexus between the alleged violation and the harm to the plaintiff," *Blue Shield*, 457 U.S. at 478, 102 S.Ct. at 2548, and because the harm to plaintiff "was clearly foreseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy." *Id.* at 479, 102 S.Ct. at 2548.

Prior to the Supreme Court's decisions in *Blue Shield* and *Associated General*, the Second Circuit used a "target area" test to determine whether an antitrust plaintiff had standing. Under that standard, a plaintiff could sue only if he could "allege a causative link to his injury which is 'direct' rather than 'incidental' or which indicates that his business or property was in the 'target area' of the defendant's illegal act." *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183, 187 (2d Cir.1970), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971) (franchisor lacks standing to sue for injury to franchisee).[4] *See also Vincel v. White Motor Corp.*, 521 F.2d 1113, 1119 (2d Cir.1975) (stockholder lacks standing to sue for injury to corporation); *Calderone Enterprises v. United Theatre Circuit, Inc.*, 454 F.2d 1292, 1295 (2d Cir.1971), *cert. denied*, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972) (landlord lacks standing to sue for injury to tenant); *SCM Corp. v. Radio Corp. of America*, 407 F.2d 166 (2d Cir.), *cert. denied*, 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (1969) (patentee lacks standing to sue for his injuries to his licensees). These cases remain influential; after the two Supreme Court decisions, the Second Circuit stated that the target area cases have not been "drained of their precedential vitality on their own or very similar facts ..." *Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 293 (2d Cir.1983) (Friendly, J.), *cert. denied*, — U.S. ——, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984).

■ Under the law of standing, a camera manufacturer has standing to sue for the antitrust violation found in *Berkey* because camera manufacturers were the "direct" victims of the violation. The secrecy agreement restricted the disclosure of the flipflash project to camera manufacturers, thereby delaying the manufacturers from designing, tooling-up, and advertising for a new product. Camera manufacturers were the "direct" victims of the violation.

Under § 4 of the Clayton Act, a distributor of a general line of photographic items is not a person injured in his business "by reason of" a conspiracy to restrain competition by keeping secret an innovation by a camera manufacturer and a flash lamp maker. Unlike a manufacturer, a distributor is remote from the violation, on a different level of the markets involved; a distributor is not a competitor of the manufacturer and not his rival. Although a distributor may suffer a loss of some kind, it is not "'the type of loss that the claimed violations ... would be likely to cause.'" *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

Injury to the distribution of a general line of photographic supplies was not a necessary step in attaining a manufacturing headstart from the illegal secrecy of the innovative flipflash. Admittedly, a camera producer is injured by the violation, and a distributor suffers too—but the latter's is not the same injury, but rather a distinct one. *Berkey* did not present the issue whether the secrecy agreement had an unreasonable impact on photographic distributors. In this case Interphoto is suing solely because of an injury to a level of the market that was not considered in *Berkey*. In short, a distributor is not in the restrained market as that was defined in *Berkey*.

---

**4.** Under the target area standing rule, "even parties whose injuries may be both immediate and foreseeable may lack standing to pursue a private remedy if that injury is indirect or incidental, or if their business was not in the target area of the allegedly illegal acts." *Long Island Lighting Co. v. Standard Oil Co.*, 521 F.2d 1269, 1274 (2d Cir.1975), *cert. denied*, 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976).

Similarly, a trademark licensor is not within the area of the economy endangered by the breakdown of competitive conditions found in *Berkey*. Such a licensor merely sells the rights to its name for use on goods designed, produced, and sold by others. It is not at the level of the market directly affected by the agreement to keep the development of flipflash secret from other camera manufacturers.

To deny standing to a distributor or trademark licensor does not leave a substantial antitrust violation unremedied, since camera manufacturers do have standing. In fact, to permit a trademark licensor or distributor to have standing would increase the risks of duplicative recovery and complex apportionment, since the Court would have to determine how to apportion damages among the actors along a lengthy chain. To allow standing in these circumstances would be contrary to the teachings of *Blue Shield* and *Associated General*.

### C. *Argus*

#### 1. *Argus Was No Longer a Manufacturer*

Argus is a publicly held Delaware corporation incorporated in 1960. Its stock was listed on the American Stock Exchange until 1974, when it was delisted. At one time Argus was a manufacturer of photographic products, including cameras. At its peak, it had five manufacturing facilities for photographic supplies and equipment located in the United States and Canada. By 1964, its five photographic manufacturing facilities had been reduced to two, one in South Carolina, and one in Ontario. Sometime prior to 1970 Argus ceased manufacturing cameras at either one. There is no evidence that Argus was a camera manufacturer at any time relevant to this action.

From 1970 to March 1, 1975, at the latest, Argus functioned as an importer and distributor of cameras manufactured abroad. Argus imported and distributed cameras labelled with the "Argus" name which were manufactured by two Japanese firms, Cosina (35 mm still cameras; 8 mm movie cameras), and Sedic (110 cameras). The Sedic Agreement described Argus as a "distributor." Argus' business with both of these firms terminated in 1974.

After March 1, 1975, Argus was not even a camera importer; it merely licensed its "Argus" trademark to Interphoto for use on cameras and other photographic equipment. Under the Argus—Interphoto licensing agreement, the latter purchased, imported, and resold cameras and had them labelled with the name "Argus." All sales of Argus labelled products were made through Interphoto. The agreement called for a royalty of 1½% on Interphoto's sales of "Argus" merchandise, but specified that no royalties were payable to Argus during the first year.

Argus' contemporaneous documents establish that it was no longer a manufacturer of cameras at the time of the flipflash announcement. There is no probative evidence to the contrary. Argus' Form 10–K for the year ending February 29, 1976, acknowledges: "Argus Incorporated ("Argus") is engaged primarily, through its 81.3% owned subsidiary, Interphoto Corporation ("Interphoto"), in importing and distributing cameras, projectors and other photographic equipment for the amateur market in the United States and Canada." [5] The only manufacturing that Argus reported was the "[l]imited manufacturing of photographic equipment, principally slide trays and viewers, ... performed by the Company's General Tool and Die Division. Such products are sold to Interphoto for distribution."

Argus' research and development had dwindled to almost nothing by the time of the flipflash announcement. Argus' Form

---

**5.** In the Argus Annual Report for the fiscal year ended February 28, 1976, its President, in a letter to stockholders dated July 21, 1976, stated: "Argus Incorporated has become principally a holding company ... its direct operations are limited to the maintenance and collection of royalties from existing patents, the development of new patents, and the service and direct warranty repair of outstanding products in the U.S."

10–K and its Annual Report, transmitted to shareholders on July 21, 1976, reported: "Argus spent approximately $115,000 during the year ended February 28, 1975 on the development of new products or services, or the improvement of existing products or services. There were no significant expenditures in 1976. It employs one employee on a full-time basis on product development."

The lack of research and development did not go unnoticed by senior Argus personnel. On June 25, 1975, E.R. Isaacson wrote Dan Porco, "As new products became fewer and fewer and as product purchases dropped off, the personnel involved were layed [sic] off indefinitely.... Suddenly now, new products are being sought and samples have been delivered for evaluation. I have no trained manpower for this type of work other than to do it myself as best I can fit it into my schedule."

In September 1976, Argus' patent attorney admitted that "he believed all products sold by Argus for the past several years were not truly of Argus design or manufacture ..."

### 2. *The Maurer Project Collapsed*

Argus' only conceivable claim to being a manufacturer of cameras after 1970 was through a venture with Maurer Commercial Products Corporation. In 1973, Argus decided to try to produce a pocket camera in this country which would solve the "redeye" problem. It made an agreement with Maurer, dated August 22, 1973, under which the latter was to produce such a camera within eight months. No such camera was ever produced.

The Agreement provided for Maurer to produce magicube cameras. It stated: "Maurer agrees to manufacture for Argus, and Argus agrees to purchase from Maurer" certain pocket cameras "according to designs, plans and specifications submitted by [Maurer] to Argus." The Agreement further provided that "Maurer is an independent contractor" and that neither party could bind the other, "the relation between MAURER and ARGUS hereunder being

solely that of manufacturer and purchaser." An amendment dated December 4, 1973, "expand[ed] the scope of work to be performed by Maurer to include engineering, design and manufacture of a second generation pocket type camera identified as the Model 40."

The Agreement, as Maurer described it in a February 26, 1974 memorandum, was a "purchase order between Argus and Commercial." Although Argus did routine product evaluation, Maurer had design responsibility; on August 27, 1974, E.R. Isaacson wrote to Maurice Day that "the evaluation [of the first C–25 camera] work was completed on 8/16 and the sample camera has been returned to Maurer to determine the cause of failure."

The camera venture was repeatedly delayed and collapsed completely before the flipflash announcement. On April 19, 1974, near the time the Agreement called for mass production, Lewis wrote to Day that "Irving [Brand of Maurer] is talking June pilot and production starting August 1 on Model C25." Yet on July 17, 1974, Porco wrote Maurer complaining that the camera had thus far cost twice what had been anticipated and saying that "there is no hope of production until early next year."

The Maurer project also was plagued by funding problems: in an inter-office memorandum dated February 26, 1974, Maurer acknowledged that it had "been unable to obtain this loan [to purchase materials] from any bank or commercial lending institution." Nine months later, on November 11, 1974, Royal Business Funds, a Maurer affiliate, wrote to the Small Business Administration that Argus "recently (two weeks ago) informed us of their inability to continue the [camera] project." In the same month, Maurer confessed judgment to Royal Business Funds in the amount of $652,643.58 because it had defaulted on a promissory note. One month later, in December 1974, the Sheriff levied on all the assets of Maurer in partial satisfaction of the judgment.

In contemporaneous documents, Argus admitted that financial difficulties contributed to the collapse of the Maurer project. On July 11, 1975, Argus General Counsel Richard Dorfman stated in a letter to Argus' auditors, Arthur Andersen & Company, that the Maurer venture "collapsed with the demise into bankruptcy of Mauer [sic]." Dorfman expressed the opinion that Argus was not liable to Maurer for the failure of the venture because "Argus's responsibilities to Mauer [sic] appear to have been contingent on Mauer [sic] obtaining financial backing, which it did not."

### 3. *Argus Does Not Have Standing*

Kodak has introduced numerous contemporaneous statements made by Argus showing that Argus had given up manufacturing cameras by the time of the flipflash announcement. Plaintiffs have not brought forward any probative evidence to the contrary, relying instead on the conclusory statements of their managements.

The documentary evidence shows that Argus had ceased manufacturing cameras in its plants, that its relationships with foreign producers had been terminated, that it had licensed Interphoto to sell "Argus" brand products, that its research and development expenditures were *de minimis*, that the Maurer project had collapsed, and that Argus had not designed or produced any new cameras in several years. Argus confined its activities to licensing its trademark and approving the quality of cameras purchased by Interphoto and sold by it. These activities place Argus outside the area of the economy endangered by the flipflash secrecy agreement. Accordingly, Argus does not have standing to sue for the violation found in *Berkey*.

Argus' desire to manufacture a camera, through the aborted Maurer project, is not sufficient to transform it into a manufacturer. Argus has not shown the requisite actual preparedness to enter the market: i.e., the "ability to finance the business and purchase the necessary facilities; consummation of contracts towards the purchase of the business; affirmative action by the plaintiff to enter business; and the background and experience [necessary to enter the business]." *Curtis v. Campbell-Taggart, Inc.,* 687 F.2d 336, 338 (10th Cir.), *cert. denied,* 459 U.S. 1090, 103 S.Ct. 576, 74 L.Ed.2d 937 (1982) (although there was "some indication of cooperation" from various financing sources, plaintiff was unable to raise $150,000 of "front money"; standing denied). *See also Martin v. Phillips Petroleum Co.,* 365 F.2d 629, 633 (5th Cir.), *cert. denied,* 385 U.S. 991, 87 S.Ct. 600, 17 L.Ed.2d 451 (1966) (no standing; plaintiff "did not have the ability to finance the business, but was hoping to obtain 100% financing from the Bank"); *Reaemco, Inc. v. Allegheny Airlines,* 496 F.Supp. 546, 554–55 n. 4 (S.D.N.Y.1980) ("plan to enter the express business and an unfinanced proposal to purchase [assets]" is not enough for standing); *Laurie Visual Etudes v. Chesebrough-Pond's, Inc.,* 473 F.Supp. 951, 956–57 (S.D.N.Y.1979) ("preparedness to manufacture" not established by "unsupported assertion of financial capacity to undertake the financing of a venture into a new and untried field"; "blueprints and handmade model" do not show capacity).

Moreover, even if Argus were a manufacturer, it would not have standing since, in this action, it asserts no claim for damages as a manufacturer, importer, or seller of cameras. Plaintiffs assert that "Argus is suing only for loss of royalties as a result of Interphoto's inability to sell Argus brand products." Such claimed injury to Argus is "remote" along an "attenuated" "chain of causation" from the injury suffered in the market by the agreement between Kodak and General Electric to withhold flipflash from camera manufacturers. Since Argus' asserted claim is so remote from the injury suffered in the market, it does not have standing.

### D. *Interphoto*

### 1. *Interphoto was a Distributor*

Interphoto is a publicly owned Delaware corporation. It was listed on the American Stock Exchange until 1979, when it was

delisted. Formed in 1961 as a national wholesale distributor of photographic, audio and related products, Interphoto branched into the resale of decorative electric lights, speakers and television sets. In 1970, Argus, which was then substantially owned by Michele Sindona, acquired 50.56% of the outstanding shares of Interphoto. In 1975–76, Sindona jettisoned his interest in Argus to members of the management of Interphoto and Argus.[6] Argus increased its stock interest in Interphoto to 80% in 1976.

Prior to 1983 and the exigencies of this lawsuit, Interphoto never claimed to have been a camera manufacturer. Beginning with its first Annual Report in 1962 until its demise in 1980, Interphoto repeatedly described itself as a company "engaged in the importation, merchandising and wholesale distribution of a broad range of consumer photographic equipment and supplies." *See, e.g.,* Interphoto Corporation Form 10–K for Fiscal Year ended February 28, 1975; Interphoto Corporation Form 10–K for Fiscal Year ended February 29, 1976. These self-descriptions do not mention any manufacturing, fabrication, or production activities.

Interphoto's 1975 Annual Report, dated May 28, 1975, stated that "Interphoto's reason for existence is to furnish manufacturers of photographic equipment and supplies with a low cost, efficient, nationwide distribution channel for their products. Interphoto distributes forty domestic product lines and sells proprietary products made by several dozen Japanese manufacturers." As recently as September 23, 1983, in its answer to interrogatories, Interphoto described itself as "a full-line distributor of products to camera stores, camera departments of department stores and similar retail outlets ..." Interphoto never re-

ported that it manufactured cameras of any kind, much less amateur still cameras.

Interphoto did not own any manufacturing facilities or employ any engineering staff. In its 10–K Forms for the fiscal years ending February 1974, 1975, and 1976, Interphoto reported that "Registrant is engaged only indirectly in the development of new product ideas and the improvement of existing products, and is dependent on suppliers for product development." In its Form 10–K filed in February 1976, Interphoto announced that it "has no material patents, licenses, franchises or concessions, except for the Argus License Agreement ... Sales of Argus label products approximated $4,000,000 in fiscal 1976."

Interphoto sold cameras only under the brand names of other firms. Interphoto's Form 10–K for the fiscal year ending February 28, 1975 reported that "Registrant has approximately 50 suppliers in the photographic field. Its purchase contracts with suppliers (with most of which Registrant has done business for many years) are for the most part arrangements at will ..."

Interphoto's distribution arrangements with three major suppliers ended during 1974 and 1975. Purchases of Yashica 35 mm cameras ended February 28, 1975; purchases of Sedic 110 cameras ended September, 1974; and purchases of Petri 35 mm cameras ended during 1975.

During 1975, Interphoto imported 110 cameras designed and manufactured by Haking and sold to Interphoto by purchase order, not long-term contract. In testimony taken in Hong Kong, the Governing Director of Haking explained the relationship and business transacted with Interphoto:

"Those cameras sold to Interphoto were not designed by Argus or Interphoto,

---

6. On June 26, 1975, July 2, 1975 and January 13, 1976, 14 insiders acquired an aggregate of 7,020,776 shares of Argus common stock, representing approximately 64% of the outstanding shares, from Fasco A.G. (a personal holding company for Michele Sindona) for an aggregate purchase price of $400,000, of which $200,000

was payable in cash and the balances payable over a two-year period. As of June 11, 1976, there were approximately 5,757 holders of record of the common stock of Argus. In the calendar years 1975 and 1976, the stock traded from a high of 50 cents per share to a low of approximately 6 cents per share.

they were all designed by ourselves. The mechanism and construction of these cameras were all done by our company. The only thing they did to the camera was to provide us with their private label brand name to be used on the cameras and also some minor exterior graphic layout suggestions regarding styling of the brand name, the colouring of the outside casings, instruction booklets or packaging. But they had nothing to do with the design of the cameras.

\* \* \* \* \* \*

"They were designed by W. Haking Enterprises Ltd., formerly known as W. Haking Industries (Mechanics & Optics Ltd.)."

Questioned whether these cameras were designed to specifications provided by Argus or Interphoto, or any company affiliated with them, the Director responded:

"No, they never provided us with any specifications for manufacture. They bought cameras of our own design." "The only thing they did was to provide us with the private brand name to be used on the cameras and slight changes of the graphic layout. They just bought what we offered."

In response to the question whether the cameras were sold exclusively to Argus or Interphoto, or any company affiliated with them, the answer was:

"No, there was no exclusive arrangement with them at all. But cameras with 'Argus' private brand name were sold exclusively to Interphoto. They never used 'Argus' as a company to buy, they only used 'Argus' as a brand name."

The witness testified that the cameras sold by Haking for resale by Argus or Interphoto did not differ from those sold to other Haking customers except for the brand name.

### 2. Interphoto and Argus Were Separate Enterprises

Interphoto contends that having proved successful in the distribution of Argus products, plans were made in 1973 and 1974 for the establishment of a fully inte-grated manufacturing and distribution operation between Argus and Interphoto for 1975. They point to the service of key executives as officers of both corporations and a complete identity of the Boards of Directors. They assert that commencing in 1973, they jointly participated in a program for the design, development, manufacture, and distribution of a 110 magicube camera. They assert that this project was continued in 1974 and 1975 in conjunction with Maurer Commercial Products Corporation. They say that "although Argus and Interphoto did not have complete identity of shareholders and although each continued as an independent corporation, it was clear that the process of manufacture and distribution was a joint and integrated process." (Porco Affidavit of February 22, 1985).

This elusive claim does not confer standing on Interphoto to assert its claims for lost "expected" sales of photographic equipment. The argument rests on the mistaken premise that Argus was a manufacturer. But even if that premise were correct, Interphoto has adduced no evidence, other than the conclusory statements of its management, to show that it was a joint enterprise with Argus. To the contrary, the documentary evidence establishes that the businesses of the firms were distinct.

Although Argus owned 50.56% of Interphoto at the time of the flipflash announcement, the companies took pains to separate their corporate identities and business functions. They maintained separate books, never consolidating the financial statements of the two firms, and presented separate Annual Reports to their stockholders.

The relations of the two companies were deliberately kept at arm's length. After Interphoto became the exclusive licensee of the "Argus" name, Argus President Maurice Day stressed the distinctiveness of the business of the two companies in a September 25, 1975 letter to Interphoto President Dan Porco:

"To make this communication quite clear, I want to state that the approval of the sale of a product with the Argus name on it is the prerogative and responsibility of Argus, and any compromise is not debatable or is the authority delegated to anyone in Argus to make an exception."

Subsequently, in an interoffice memorandum dated March 25, 1976, Porco stated that "[a]ll of the dealings between Interphoto and Argus have been fully arm's length and the resulting schedule of royalties represents the results of long discussions and are based on many factors, both marketing and economic."

A September 29, 1975 letter to the SEC from Interphoto Vice President Jerold B. Friedman objected to a Commission suggestion that Argus and Interphoto consolidate their financial statements on an equity basis. Friedman stated:

"Argus and Interphoto have always had separate working capital financing from different lending sources. Furthermore, due to the restrictive nature of Interphoto lending agreements, the working capital and other assets of Interphoto have never been available to Argus, despite severe working capital shortages and losses of Argus."

Friedman added that:

"During five years of Argus' investment in Interphoto through June 1975, Argus has never been responsible for any of the debts of Interphoto through guarantees or other arrangements."

Friedman told the SEC that in July 1975, when Interphoto's principal lender, Walter E. Heller & Company, Inc., requested that Argus guarantee Interphoto's borrowing under an $8,000,000 line of credit, Argus had refused, guaranteeing only $500,000. After stating that "[t]his sole guarantee is not significant ...," Friedman concluded:

"We feel that it would be inappropriate to reflect the working capital, other as-

sets, or the liabilities of Interphoto in consolidated financial statements of Argus, when Argus has no claim to such assets nor obligations with respect to such liabilities ..."

There is absolutely no specific probative evidence that Argus and Interphoto were integrated companies.

### 3. *Interphoto Does Not Have Standing*

Interphoto claims that it was injured as a competitor of Kodak in the wholesale distribution of cameras and that the "flipflash conspiracy gave Kodak an illegal advantage in the sale of its pocket cameras over Interphoto and other distributors competing with Kodak." However, Interphoto cannot rely on *Berkey* to show that this asserted injury arose from an unreasonable restraint of trade. The *Berkey* court simply was not confronted with the question of whether the flipflash conspiracy gave Kodak a competitive advantage in the *wholesale* distribution of pocket cameras.[7]

Because a distributor is remote from the *Berkey* violation, Interphoto does not have standing as a distributor of photographic equipment. Moreover, Interphoto's contemporaneous statements, which were introduced by Kodak, establish that Interphoto was only a distributor at the time of the flipflash announcement. Prior to this lawsuit, Interphoto never claimed to be a camera manufacturer. It has never owned or invested in facilities for manufacturing, designing, or fabricating cameras. Rather, it bought cameras for resale from numerous suppliers, frequently substituting among them. Plaintiffs have not brought forward any probative evidence that it was anything other than a distributor, relying instead on the conclusory statements of their management. Such statements, however, have not raised any genuine issue of material fact

---

7. Professor Areeda has described the *Berkey* ruling pertaining to flipflash as follows: "The Court affirmed a jury verdict finding an unreasonable restraint of trade in Kodak's agreements with General Electric and Sylvania providing for cooperation in developing camera flash equipment and restricting the freedom of General Electric and Sylvania to disclose developments to *rival camera makers.*" (Emphasis supplied). Areeda, Antitrust Analysis, at 229 n. 79 (3d ed. 1981).

that contradicts or is at variance with the documentary proof.

## V. CAUSATION

Apart from plaintiffs' lack of standing to complain, it is clear that the violation asserted was not the proximate cause of the injuries claimed.

### A. *Contentions*

Interphoto has claimed damages for its actual business losses from 1975 through 1980 as well as for "lost" profits on "expected" sales of all products from 1975 through 1985. The company contends that the flipflash secrecy agreement caused "direct" damage to its sales of 126 and 110 cameras and "indirect" damage to its sales of other products, leading to its demise in 1980.

Plaintiffs give the following account of the chain of causation between the flipflash agreement and their alleged injuries. To begin with, Interphoto needed a "leading line" to serve as a door opener so that it could sell a broad range of photographic products. Sometime in 1974–75, the management of Argus and Interphoto decided that Interphoto's only leading line in 1975 would be Argus 110 magicube cameras. However, such cameras were rendered "obsolete" by flipflash. Although Interphoto moved quickly after the flipflash announcement and arranged to buy a flipflash compatible camera from Haking, the latter was unable to deliver the cameras in commercial quantities in time for the 1975 Christmas selling season. The argument continues that, since Interphoto did not have flipflash cameras, it lacked a leading line for the 1975 Christmas season and had no door opener during the period when it usually did a substantial portion of its business, causing its sales of other items necessarily to fall.

The plaintiffs allege that they lost credibility with their customers when Interphoto was unable to make the deliveries of flipflash cameras that they had promised to dealers in time for Christmas. The customers allegedly then turned to other distributors. In a chain reaction thereafter, it is contended that Interphoto's sales declined, its credit was further restricted, its product availability was reduced, it suffered further sales losses in 1976 and later years, and ultimately, five years later in 1980, it went out of the wholesale photographic distribution business.

### B. *Applicable Law*

■ In order to recover for antitrust injuries, a plaintiff in an antitrust case must establish a causal link between the alleged loss and the unlawful conduct. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969). The causal connection must be sufficient to show that the violation was a "material cause" or "substantial factor" in causing plaintiff's injuries. *See id.; Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703, 711 (2d Cir. 1983).

Injuries that are only remotely connected to the illegal conduct are not legally cognizable or compensable. Any antitrust violation is likely to cause "ripples of harm," *Blue Shield*, 457 U.S. at 476–77, 102 S.Ct. at 2546–47; *see also Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183, 187 (2d Cir. 1070), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971) ("ripples of injury"), but the Clayton Act's protection does not extend to the outermost perimeters of impact: "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 892 n. 14, 31 L.Ed.2d 184 (1972).

■ The doctrine of proximate cause applies in Clayton Act § 4 litigation, denying relief where the causal connection between the violation and injury is uncertain, remote, or speculative. *Associated General Contractors*, 519 U.S. at 532–535, 103 S.Ct. at 905–907. Thus, the harm alleged must be "the type of loss that the claimed violations ... would be likely to cause," *Brunswick Corp. v. Pueblo Bowl-O-Mat Corp.*,

429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), and no recovery may be had for an injury that is "too tenuous and conjectural for a valid causal finding." *Reading Industries, Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 14 (2d Cir. 1980), *cert. denied*, 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981).

### C. *No Probative Evidence of Causation*

Whatever the hypothetical plausibility of plaintiffs' theory, there is no factual support—no specific probative evidence—for the alleged causal links between the agreement not to disclose the development of flipflash and the collapse, five years later, of Interphoto's distribution business. The links rest merely on conclusions of plaintiffs' witnesses, and no more.

No evidence supports Interphoto's contention that flipflash "obsoleted" the Argus 110 cameras using magicube or gave Kodak a competitive advantage. To the contrary, Interphoto actually purchased 50,000 flashcube cameras from Haking in the summer of 1975 to be delivered at the rate of 10,000 per month. Moreover, Interphoto's share of the amateur still camera market showed a slight increase in 1975, whereas Kodak's share of the market declined. During the period from 1974–76, Kodak's sales of 110 cameras declined from 4,168,000 in 1974, to 4,077,000 in 1975, to 3,238,000 in 1976. Its share of the amateur still market declined from 75% in 1974, to 70% in 1975, to 59% in 1976.

Similarly, there is no documentary or other probative evidence that customers shifted purchases from Interphoto to Kodak because of flipflash. Plaintiffs concede that Vivitar and Keystone drew business from Interphoto in 1975, even though neither of those firms had a flipflash camera on the market. The biggest sales increase was made not by Kodak and flipflash, but by Vivitar and the built-in electronic flash (a feature which was not offered by Kodak or Interphoto in 1975). Although Vivitar had entered the market only in 1974, it had become the second largest seller of 110 cameras by 1975.

There is also no specific probative evidence that the unavailability of flipflash had an adverse impact on sales of other photographic products during the 1975 Christmas season or thereafter. Not a single document showed a link between sales of cameras and other items. No customer was identified who reduced purchases of photographic supplies because of his inability to purchase flipflash.

Moreover, there is no evidence to support plaintiffs' contention that Argus 110 cameras would have been a useful lead line for Interphoto's full line of photographic products. Indeed, as of March 1, 1975, there was no Argus 110 camera to substitute for the cameras in the cancelled arrangement to buy from Sedic. Sedic's last sales to Argus were in 1974, and Maurer's camera never came into production. In 1975, the only 110 cameras with the Argus label that were available to Interphoto between March 1 and the deliveries from Haking that started in October were those in inventory that had been bought from Sedic in 1974. The ability of the magicube cameras on hand to serve as a lead line item or door opener was speculative in 1975 and remained so.

To support their "lead line" theory, plaintiffs irrelevantly rely on cases involving the wrongful termination of a distribution arrangement, in which the courts found a causal connection between the cut-off of one product and the distributor's subsequent loss of sales of other products. *See e.g., Spray-Rite Service Co. v. Monsanto Co.*, 684 F.2d 1226 (7th Cir.1982), *aff'd*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Greene v. General Foods Corp.*, 517 F.2d 635 (5th Cir.1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976); *Westman Comm'n Co. v. Hobart Corp.*, 461 F.Supp. 627 (D.Col.1978); *Fuchs Sugar & Syrups, Inc. v. Amstar Corp.*, 447 F.Supp. 867 (S.D.N.Y.1978), *rev'd on other grounds*, 602 F.2d 1025 (2d Cir.), *cert. denied*, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979); *Interphoto Corp. v.*

*Minolta Corp.,* 295 F.Supp. 711 (S.D.N.Y.), *aff'd,* 417 F.2d 621 (2d Cir.1969). In these cases, suppliers illegally terminated a distributor's right to sell a well-known branded product (e.g., Maxwell House coffee in *Greene*). The distributors claimed that they had lost sales of other products ("follow on sales") because they no longer carried the well-known items. Because of the documented "door opener" effect of the terminated brand product, the facts established a proximate causal connection between the illegal conduct and the lost sales of other products.

These so-called "leading line" decisions are inapplicable to the claims that plaintiffs make here. Each of those cases involved nationally known products with proven ability to draw customers (who then might purchase other items). By contrast, the conclusory claim that Argus 110 cameras would have attracted follow-on sales in 1975 is entirely conjectural, unsupported by a track record or any other probative evidence such as a market survey. Each of the leading line cases involved the complete termination of the supplier—distributor relationship, whereas here, there was no rupture of Interphoto's relationship with Argus or any other supplier because of flipflash. In those cases, the terminated dealers faced competition from others who were selling the lost brand; here, no brand was lost. Finally, each of those cases arose out of a long-term contractual relationship which, on the facts presented, made the loss of follow-on sales foreseeable. Here, Kodak had no such contractual involvement with Interphoto and the element of foreseeability is absent.

In sum, the conclusory testimony offered in support of the contrived lead line theory as an explanation for Interphoto's decline in 1975 and later years does not create—as a matter of law—a genuine issue of fact. No probative evidence indicates a causal nexus between the flipflash camera and lost sales of a wide range of photographic supplies. There is no proximate causal link between the harm alleged and the flipflash agreement.

### D. Substantial Evidence of Interphoto's Decline

#### 1. Factors Other Than Flipflash

A starkly different picture of Interphoto's disintegration emerges from the documentary evidence that *is* in the record. At the time of the flipflash announcement, the company was in dire financial shape. Interphoto acknowledges as much, but now contends that the financial crisis was over and it had divested itself of its unprofitable divisions.

However, the records show that Interphoto's entire operation was in trouble. Interphoto's net loss for the three years from March 1, 1972 to February 28, 1975 was $22,283,852, whereas its net income for the 12 years from 1961 to 1972 was only $11,-126,392. Contrary to Interphoto's present assertion, even its photographic distribution business was unprofitable: its Form 10–K for the year ending February 1975, reports before-tax losses from photographic products as follows: in year ending February 1973, $685,000; in year ending February 1974, $1,846,000; and in year ending February 1975, $4,748,000.

In 1973, Interphoto began borrowing its working capital from Walter E. Heller & Company at 6% above the commercial paper rate (and subsequently 6% above prime). In return for the loans, Interphoto was required to pledge all of its assets as collateral. In July 1974, Heller asked Argus to guarantee a $8,000,000 line of credit for Interphoto; Argus refused, guaranteeing only $500,000.

Interphoto claims that it was losing money because of the overall depression in the photographic market, but that it remained strong in that market. However, Interphoto was losing not only money but also its *share* of the wholesale photographic market. The depressed market could account for a decline in profitability, but it could not explain Interphoto's decline in market

share. Interphoto's evaporating market share for the relevant period was:

| | |
|---|---|
| 1965 | 1.84% |
| 1966 | 1.46% |
| 1967 | 1.49% |
| 1968 | 1.32% |
| 1969 | 1.15% |
| 1970 | 0.87% |
| 1971 | 0.92% |
| 1972 | 0.88% |
| 1973 | 0.88% |
| 1974 | 0.58% |

Interphoto's photographic workforce was shrinking during this time. Its sales force declined from 125 to 60 employees from mid-1974 to mid-1975. Interphoto's total workforce in its domestic operations declined from 425 on July 1, 1974 to 264 on February 1, 1975; on March 1, 1975, Interphoto introduced a plan to further reduce its personnel to 240. Near the end of 1974, Interphoto closed three of its seven warehouses.

Interphoto lost one-half of its sources of supplies between 1974 and 1975. In particular, effective February 28, 1975, Interphoto lost Yashica products, which had accounted for $11 million—or 30%—of Interphoto's entire wholesale photographic sales for the prior year. Interphoto's relationship with Cosina terminated in 1974 and with Petri in 1975, and it no longer had Sedic as a source of supply of 110 cameras after 1974. By approximately March 1, 1975, Interphoto no longer had any suppliers of 110 cameras, and had no manufacturing facilities or other sources from which to obtain them.

Interphoto claims that it was going to make up for those terminations and losses of products with the "expected" Maurer 110 camera and imported cameras under the brand names Argus, Accura, and Sunset. But during 1974, Interphoto sales of Argus brand *products* had dwindled to only $4.1 million, and Argus brand *cameras* totalled only $445,000. The Maurer camera never became available in 1974 as hoped for, and concededly, was not available even in April 1975. Due to Interphoto's precarious financial circumstances, its suppliers required letters of credit to se-

cure payment for future deliveries, but those letters of credit were not forthcoming until August 1975.

### 2. *Contemporaneous Explanations*

Plaintiffs' current stance that flipflash automatically and immediately "obsoleted" magicube in 1975 is of recent origin and contradicts its previous position in this case, asserted when there was a question about the bar of this suit by the statute of limitations. In their May 7, 1981 Answers to Interrogatories, plaintiffs' position was that a new product does not obsolete an old one until the new one gains "significant market acceptance," usually about a year after its introduction:

"Injury as to each aforesaid anticompetitive act or practice respecting the marketing of new or modified products by defendants commenced on or about the date that each such product obtained significant market acceptance with the effect of obsoleting competing products, which generally occurred at least one year following the commencement of widespread marketing to the consuming public."

Only in its Annual Report of the year ending February 28, 1975, dated May 28, 1975, did Interphoto ever allude to a new Kodak camera. In this Report, issued six weeks after the flipflash, Porco wrote, "Kodak has again introduced a new Pocket Camera that obsoletes existing Pocket Cameras and our inventory and suppliers of 110 Pocket Cameras are in jeopardy." The Annual Report does not suggest that Kodak's "new camera" would or did have any impact on sales for any other Interphoto product. Interphoto's Annual Report for the year ending February 28, 1976, issued a year after the flipflash camera was introduced, does not even mention flipflash or any impact on Interphoto's sales performance. Rather it attributes Interphoto's poor 1975 performance to the other factors with which it was struggling.

Interphoto now claims that it was emerging from its financial morass in 1975, that having divested itself of its unprofitable subsidiaries, it would have succeeded but

for the absence of flipflash from its product offerings for the 1975 Christmas selling season. However, contemporaneous documents authored by Interphoto officials conclusively contradict that litigation stance. As early as January 1973, before Interphoto began experiencing its large losses, James Coombes, Interphoto's Executive Vice-President, wrote, "nothing short of several years of steady, impressive progress on the income statement will mend our fences." In its Form 10–K and its Annual Report for the year ending February 28, 1979, Interphoto asserted:

"Interphoto Corporation (the "Registrant") was engaged, prior to May 1975, in various businesses including photographic equipment (wholesale distribution and retail mail order), consumer electronic (home entertainment products) and decorative lighting products. After incurring substantial operating losses in the non-photographic operations, such businesses were divested. However, largely as a result of the impact of such businesses on the financial condition of the Registrant, its operations have continued to be unprofitable." ...

Interphoto's contemporaneous documents also show that it attributed its inability to meet its 1975 sales forecast to factors other than flipflash. On November 11, 1975, in the midst of the important Christmas selling season, Porco informed Interphoto's Board of Directors, "Our sales were not up to forecast. The only valid excuse we have is that we were not able to get our fall goods on time. L.C.s [letters of credit] were not available until late in August." Similarly, on December 12, 1975, Porco wrote:

"Our Christmas season will be the best ever for most of our domestic lines and the worst ever for imported products.... Our problems on the imported lines included the final discontinuation of the Petri cameras after many months of difficulties. We have a new and exciting number of products under Argus, Formula 5, and Accura labels. But, because of late order by us, slow L.C.'s and late shipments, approximately $4 million worth of products did not arrive here in time for the Christmas season."

Porco did not so much as allude to the flipflash camera or its impact on Interphoto's "continue[d] discouraging" performance.

In its Form 10–K for the year ending February 29, 1976, Interphoto again attributed its dismal 1975 sales performance to factors other than flipflash:

"During its past two fiscal years ended February 29, 1976, Registrant experienced substantial declines in sales attributable primarily to the general depression in the consumer photographic industry, late deliveries of imported products from the Far East and particularly the termination, effective February 28, 1975, of its long-standing agreement for exclusive distribution of Yashica products. Sales of Yashica products accounted for approximately 26% of Registrant's sales in fiscal 1975."

Even in its Form 10–K for the year ending February 28, 1977, with the benefit of a year's hindsight, Interphoto still attributed its problems for the year before to factors other than flipflash:

"Sales in fiscal 1976 declined approximately $18 million from year earlier levels. This substantial decline was attributable to various factors, primarily the discontinuance effective February 28, 1975 of the distribution of Yashica cameras, which had accounted for approximately $11 million of 1975 sales. Late delivery of products imported from the Far East and the general depression in retail photographic sales accounted for the additional loss in sales volume."

None of Interphoto's contemporaneous official documents laments the loss of customers because of Interphoto's inability to sell 10,000 additional flipflash cameras which it allegedly promised the customers for Christmas 1975. In fact, Interphoto conducted a survey of its customers in 1976 and none of them complained about Interphoto's inability to deliver flipflash.

In its published 1979 Annual Report, Interphoto reported, "A material part of the business of Registrant and its subsidiaries is not dependent upon a single customer, or a very few customers; therefore, the loss of any one customer would not have a materially adverse effect on the Registrant."

The first time that Interphoto even remotely alludes to the flipflash as the cause for its financial decline is four years later, in its 1979 Annual Report, where Porco wrote, "Ever since the Bell & Howell and Fotomat settlements with Kodak were completed and the Berkey and GAF suits were filed, we have been searching for the means of entering the antitrust fray. We believe that our case is better than the two settlers and the two litigators."

## VI. DAMAGES

Apart from plaintiffs' lack of standing to sue and the absence of a proximate causal link between the violation and the injury alleged, it is clear that plaintiffs have not formulated cognizable damage claims or presented probative evidence for the claims that they have presented. This conclusion rests not on the credibility of plaintiffs' witnesses, but rather on the complete absence of any specific probative evidence to support their conclusory averments.

### A. *Contentions*

Interphoto claims damages of lost sales for its entire wholesale photographic distribution business from 1975–1985. Argus claims lost royalties that it would have earned from Interphoto's expected sales of all Argus brand products from 1975–1985. To calculate their damages, both plaintiffs rely on the projections in Interphoto's 1975 business plan and ten year forecast.

Kodak's principal contention is that plaintiffs' damage theories rest on speculative and irrational assumptions. They maintain that plaintiffs irrationally claim damages for their entire business and all product lines, without showing the linkage between the sales of 110 cameras and other photographic products. Kodak also objects to plaintiffs' alleged failure to articulate or

provide objective justification for the assumptions underlying the Interphoto business plan and forecast.

### B. *Applicable Law*

No recovery can be had under § 4 of the Clayton Act "unless it is shown that, as a result of defendants' acts, damages in some amount susceptible of expression in figures resulted." *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906, 909 (2d Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962), *quoting Keogh v. Chicago N.W. Ry. Co.,* 260 U.S. 156, 165, 43 S.Ct. 47, 50, 67 L.Ed. 183 (1922). The rule is that

> "While the amount of damages is measured by a less exacting standard than proof of violation and injury, the trier-of-fact must be furnished with evidence sufficient for a determination that the loss is not speculative, for not all antitrust violations cause loss and not all losses are measurable."

*Jot-Em-Down Store (JEDS) Inc. v. Cotter & Co.,* 651 F.2d 245, 246 (5th Cir.1981). A jury "may not render a verdict based on speculation or guesswork." *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946).

It is the obligation of a Court to exclude, *in limine,* exhibits and damage theories which are based on speculation and guesswork, and are not "sufficiently probative." *Shannon v. Crowley,* 538 F.Supp. 476, 483–84 (N.D.Cal.1981). *See also Pacific Mailing Equipment Corp. v. Pitney Bowes, Inc.,* 499 F.Supp. 108, 118–19 (N.D.Cal.1980) ("pro forma profit and loss statements, entirely unannotated and totally failing to reflect their source or the underlying computations" are excluded; "opinion lacking any factual support should [not] be permitted to go to the jury to form the keystone of plaintiff's damage computation"). Professor Areeda has aptly stated:

> "Because satisfactory proof of damages is itself an essential element of the treble damage suit, the court can and

should terminate the suit whenever it appears that damages are unlikely to be proved or capable of proof with reasonable judicial economy or, if proved, would not flow from the doctrinal reasons for finding that the defendant's conduct violates the anti-trust laws."

Areeda, *Antitrust Analysis* at 81 (3d ed. 1981).

### C. *Interphoto's Damages Are Speculative*

#### 1. *The 1975 Business Plan*

Plaintiffs contend that Interphoto's business plan for 1975 is probative evidence of what Interphoto would have earned in the next ten years but for the flipflash conspiracy and loss of sales during Christmas 1975. Interphoto management prepared a business plan every year for the upcoming fiscal year, delineating projected expenses and revenues by item. The plan they allegedly prepared in late 1974 and early 1975 for the year ending February 29, 1976 projected $30.1 million of Interphoto sales of photographic products to retailers; yet, Interphoto's actual sales to retailers were only $17.5 million.

Not even Interphoto placed any credence in its projections. In prior proceedings, Interphoto itself asserted that the plan was speculative, although it now expresses a different view. In an October 12, 1981 affidavit in response to Kodak's motion for summary judgment based on the expiration of the statute of limitations, Interphoto President Porco claimed that the plan was speculative. Under oath, Porco stated that the plan could not have been used to calculate Interphoto's 1975 damages because:

"although plaintiffs needed to make some kind of guess as to what its possible production and purchases of equipment should be each year and, therefore, developed documents called *"projections"*, in reality, the accuracy of these documents was *never relied upon* and a comparison between projections and actual sales even on an extremely short-term basis showed vast differences. During the relevant period, there were times when our *projections exceeded actual sales by a magnitude of 2 or 3 times."* (Emphasis supplied.)

Similarly, Argus' former Vice-President of Marketing, Jerome Littman, swore in an affidavit dated October 7, 1981:

"This volatility is established by viewing the projections which plaintiffs made through the years and viewing those projections in comparison to actual sales.... *[P]rojections can be off 200 and 300 per cent* despite the most diligent efforts to make these projections as accurate as possible ..." (Emphasis supplied.)

The plan did not take into account the various factors, unrelated to flipflash, which caused Interphoto financial difficulties: for example, the loss of important suppliers. In the year ending February 1975, over 30% of Interphoto sales were of Yashica cameras ($11 million worth of sales). However, the Yashica connection ended effective February 1975 and Interphoto did not have an existing new line to introduce. The plan assumed that Interphoto's remaining lines would grow at 23%, yet plaintiffs failed to put forward any explanation for this high rate of growth.

Similarly, Interphoto's plan projected $3 million worth of sales of Petri 35 mm cameras even though Interphoto's relationship with Petri was discontinued in 1975. Interphoto's actual sales of the Petri camera inventory were only $1 million. The plan did not reflect the loss of Petri; plaintiffs did not explain how they intended to make up for lost sales of Petri product.

Interphoto's plan projected Kako strobe sales of $1 million; Kako also discontinued its relationship with Interphoto in 1975 and substituted Yashica as its exclusive distributor. Interphoto sold only $200,000 worth of Kako goods in the year ending February 1976.

The business plan also was flawed because it did not take into account that GAF, the manufacturer of the Sawyer projecter, revised its distribution agreement with Interphoto on March 18, 1975, two weeks after the beginning of the new fiscal year.

The new distribution agreement permitted GAF to appoint several new distributors for its Sawyer products. In 1974, Interphoto sold $3.1 million of Sawyer products; the 1975 plan projected that Interphoto would sell $6.6 million of Sawyer products, or 22% of Interphoto's total sales to retailers. Interphoto's actual sales of Sawyer products were only $1.8 million.

Interphoto's contemporaneous documents attributed the lost Sawyer sales to GAF and not to flipflash. On August 2, 1976, Kenneth Lacy told Interphoto's Board of Directors, "Four years ago Interphoto sold $6 million worth of Sawyer products—last year we sold only $1.5 million. We feel this is a direct result of GAF's inattentiveness to the Sawyer products. We feel that we can project sales of this product at between $2.3 to $2.8 million."

The plan was not revised to account for crucial changes that occurred in 1975. For example, prior to 1975, Argus, not Interphoto, sold to catalogue, stamp, and premium equipment houses ("Argus Special Markets"). In the year ending February 1975, Argus sold $1.5 million to those markets. Yet the plan projected Interphoto sales of $2.4 million, apparently without taking into consideration that Interphoto, not Argus, would now be selling to these markets. Moreover, Argus' Vice-President of the Special Markets Division, Robert Lewis, resigned effective May 9, 1975. Interphoto did not explain how it intended to make up the "personnel" gap and add $0.9 million worth of sales at the same time.

Moreover, the plan did not anticipate the delays associated with the imported products. The plan projected $9.7 million worth of sales of imported products; actual sales were $5.4 million. On December 12, 1975, Porco wrote that "because of late order by us, slow L.C.'s and late shipments, approximately $4 million worth of [imported] products did not arrive here in time for the Christmas season."

Plaintiffs contend that the plan is reliable since the first quarter projections nearly equalled actual sales: predicted sales were $5,131,450 and actual sales were $5,373,000. However, the asserted correlation does not establish the reliability of the plan because the first quarter projection is too low. Historically, Interphoto sold 21.2% of its dollar volume in the first quarter, but the plan predicted sales of only 17%. In other words, the plan predicted that Interphoto would sell *below* the historical seasonal average in the first quarter. Since the first quarter prediction was lower than the seasonal average, the plan also predicted Interphoto sales *above* the seasonal average for the remaining three quarters. Plaintiffs never explained how they intended to sell above the seasonal average later in the year, especially after the Yashica inventory ran down, the Petri and Kako lines were terminated, and GAF added distributors.

■ Because the plan was based on speculative and unfounded assumptions, it is not probative of Interphoto's losses and is not admissible evidence of damages. As Judge Friendly pointed out, exhibits should be excluded when they create "a delusive impression of exactness in an area where a jury's common sense is less available than usual to protect it." *Herman Schwabe, supra,* 297 F.2d at 912.

### 2. The 1975–1984 Forecast; Expert Testimony

Plaintiffs also rely on a 10 year forecast, prepared for trial by Interphoto management, of Interphoto's alleged lost sales for fiscal 1975 through 1984. The forecast projected Interphoto sales of photographic products of $824.7 million and Interphoto sales of Argus brand products of $352 million. Plaintiffs called Dr. Kenneth Warwick to testify that the forecast was a "fair and reasonable amount." Kodak contends that both the forecast and Dr. Warwick's testimony are inadmissible as evidence.

In ruling on the admissibility of the proposed expert testimony, the Court

"possess[es] not only the power under Fed.R.Evid. 403 to determine whether it had a propensity for misleading or confusing the jury, but also the discretion-

ary right under Fed.R.Evid. 703 to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony." *Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir.1984) (citations omitted). As is the case with other proposed evidence, *in limine* consideration of expert testimony is appropriate. *Id.*

Dr. Warwick based his opinion on the conclusory statements of managment, and not on his independent evaluation of the facts. For example, Dr. Warwick relied on management's assertions that Interphoto used a lead line, that Argus 110s were to replace Yashica, that Argus had strong brand name recognition, that flipflash was superior to magicube, and that Vivitar's built-in strobe did not cause Interphoto's decline.

Dr. Warwick admitted that he did not conduct any surveys of the strength of Argus' brand name, did not examine or review Interphoto's customer orders or commission runs, and did not identify a single customer Interphoto lost because of flipflash. He also admitted that his studies of the market shares "went up to just before the introduction of Flipflash.... I stopped I think at '74." Moreover, although Dr. Warwick expressed the belief that the "total sales in 1974 [of Argus brand cameras] were ... of the order of 100,000 units," the parties have stipulated that Interphoto sales of Argus brand cameras in 1974 were only 11,693.

■ The speculative and conclusory testimony of Dr. Warwick is of little worth to a jury and his conclusions must be excluded to avoid confusion. Expert opinion, "unsupported by facts, that but for the defendants' conduct plaintiff would not have suffered losses does not convert the evidence of operating losses into evidence of damage flowing from defendants' antitrust violation." *Murphy Tugboat v. Shipowners & Merchants Towboat*, 467 F.Supp. 841, 864

(N.D.Cal.1979), *aff'd*, 658 F.2d 1256 (9th Cir.1981), *cert. denied* 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982). Dr. Warwick's testimony and the 10 year forecast are unsupported by reasonable assumptions and would be excluded at trial.

### D. *Excludable Damage Claims*

If plaintiffs were to proceed to trial, they would not be permitted to recover damages for losses outside the amateur still camera market and beyond the time when flipflash cameras became widely available, in February 1976, when competition was no longer restrained.[8] Plaintiffs can recover damages only for the type of injury that the "antitrust statute was intended to forestall." *Associated General*, 459 U.S. at 540, 103 S.Ct. at 910. *Berkey* provides absolutely no support for the proposition that the antitrust laws were intended to compensate a distributor for lost sales of a wide variety of miscellaneous photographic products or a trademark licensor for lost royalties on the distributor's lost sales simply because a camera manufacturer and flash manufacturer agreed to withhold information from manufacturers about a new flash device.

Moreover, only damages which are the "certain result of the wrong" can be recovered. *Story Parchment*. 282 U.S. at 562, 51 S.Ct. at 250. The collapse of Interphoto's entire photographic distribution business and Argus' lost royalties are far removed from Kodak's refusal to disclose a flash device for one camera.

### VII. CONCLUSIONS

1. Neither plaintiff is a person injured in his business or property by reason of anything forbidden under the antitrust laws within the meaning of Section 4 of the Clayton Act.

2. Neither plaintiff has asserted a claim based on the direct impact of the flipflash secrecy agreement on the manufacture of

---

**8.** During oral argument in *Berkey,* Judge William H. Mulligan stated that "The question [on damages] would be ... how long would it take a reasonably able camera manufacturer to get into the market. That would presumably place some limitation on the time period over which damages could be recovered." (Tr. at 99)

amateur conventional still cameras. Plaintiffs' claims rest exclusively on *Berkey Photo, Inc. v. Eastman Kodak Co.*, and the secrecy of the development of the flipflash and a compatible camera. That authority does not sustain the claims.

3. Neither plaintiff was engaged in the business directly affected by the flipflash secrecy agreement: amateur conventional still camera manufacturing.

4. The injury and damages claimed by each plaintiff are indirect, remote and speculative.

5. By reason of Conclusions 1, 2, 3 and 4, plaintiffs lack standing to sue. *Associated General Contractors v. California State Council*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983); *Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290 (2d Cir.1983), *cert. denied, — U.S. —*, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984); *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079 (6th Cir.1983).

6. Neither plaintiff has asserted a claim for injury and damages proximately caused by the flipflash secrecy agreement. *Associated General Contractors, supra; Brunswick Corp. v. Pueblo Bow-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Story Parchment Co. v. Patterson Parchment Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Reading Industries, Inc. v. Kennecott Copper Corp.*, 631 F.2d 10 (2d Cir.1980), *cert. denied*, 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981).

7. Plaintiffs have failed to adduce sufficient probative evidence of causation-in-fact to warrant submission of their claims to a trier of fact. *Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703 (2d Cir.1983); *Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575 (5th Cir.), *cert. denied*, 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982).

8. Plaintiffs' damage theories are not just and reasonable estimates and do not meet the minimum standard of rationality required for submission to a jury. *Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 264,

66 S.Ct. 574, 579, 90 L.Ed. 652 (1946); *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906 (2d Cir.). *cert. denied*, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962).

The defendant's motion for summary judgment is, accordingly, in all respects, granted, and the action is dismissed on the merits, with costs.

The foregoing, together with further pertinent details set forth in the defendant's Proposed Findings of Fact, filed May 22, 1985, which the Court has stamped "Found" (as amended), shall constitute the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a).

Plaintiffs have devoted an enormous amount of effort, time, and paper work to obscuring the dispositive legal posture of this case, namely, the incontrovertible position of the plaintiffs as outsiders of the relevant market, viz., the "manufacture" of 110 and 126 pocket cameras. That was the only market involved in the *Berkey* collateral estoppel, and the only market in which competition was legally affected by the flipflash secrecy agreement. The impact of that violative agreement for antitrust purposes was plainly placed on the level of commerce relating to competition among camera manufacturers. There was no colorable basis for plaintiffs to assert otherwise.

The growing cost, complexity, and burdensomeness of civil litigation have become a serious concern to the public as well as to judges and lawyers. Misuse and abuse of the litigation process have become hallmarks of unreasonable and vexatious actions. *See* Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look*, 104 F.R.D. 181 (1985); *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 253–254 (2d Cir.1985).

An application has been made by the defendant for an award of an appropriate sanction under Rule 11, Fed.R.Civ.P., which, if granted, will be entered at the foot of the judgment of the dismissal as additional costs.

To be considered in that connection are: the assertion in the complaint of multiple

charges of violations and injury, most of which were withdrawn after extensive discovery involving inordinate expenditure of time, effort, and expense by the defendant; the assertion of claims that were contradicted by plaintiffs' own internal documents and records, by required filings with the Securities and Exchange Commission and the American Stock Exchange, and by reports issued to stockholders; the escalation of the damage claims for 1975 from $78,000 (asserted in 1981) to more than $2,800,000 (asserted in 1984); the oral testimony in open court on a highly material matter that was later recanted and was contradicted by documentary evidence in plaintiffs' possession; the tendency of the foregoing to frustrate and impede the fair consideration of the issues during the pretrial phase and again on the motion for summary judgment; and other pertinent items that may be called to the Court's attention.

Such matters will be considered on papers to be presented by the defendant within two weeks of this date, and responded to by the plaintiffs within 10 days thereafter. A hearing will be held if requested by any party or if required by the Court following the submission of the papers.