**ARGUS INCORPORATED and
Interphoto Corporation,
Plaintiffs-Appellants,**

v.

**EASTMAN KODAK CO.,
Defendant-Appellee.**

**No. 670, Docket 85–7549.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 6, 1986.
Decided Sept. 8, 1986.

David R. Taxin, New York City (Earnest Allen Cohen, Marchi Jaffe Cohen Crystal Rosner & Katz, New York City, of counsel), for plaintiff-appellant Interphoto Corp.

Myles J. Ambrose, Washington, D.C. (O'Connor & Hannan, Washington, D.C., of counsel), for plaintiff-appellant Argus Inc.

Abner P. Slatt, New York City, for plaintiff-appellant Argus Inc.

Robert MacCrate, New York City (John L. Warden, William L. Farris, Marcy Engel, Sullivan & Cromwell, New York City, of counsel), for defendant-appellee.

Before FEINBERG, Chief Judge, FRIENDLY,* and WINTER, Circuit Judges.

WINTER, Circuit Judge.

This action involves a claim based on the conduct of defendant Eastman Kodak Corporation ("Kodak") held to be an antitrust violation in *Berkey Photo Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 301–04 (2d Cir. 1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). It was brought by Argus Incorporated ("Argus"), a licensor of the trademark "Argus" for use on camera equipment, and Interphoto Corporation ("Interphoto"), a wholesale distributor of cameras and camera equipment controlled by Argus. They seek monetary damages under the Clayton and Sherman Acts, 15 U.S.C. §§ 1, 15(a) (1982). Plain-

tiffs appeal from Judge Pollack's granting of Kodak's motion for summary judgment. 612 F.Supp. 904 (S.D.N.Y.1985). Because a reasonable trier of fact could not find that Kodak caused the damages claimed by Argus and Interphoto, we affirm.

### 1. *History and Prior Proceedings*

This case involves the evolution of new flash devices for cameras. In 1965, Kodak introduced the flashcube, a four-sided device that rotated after each shot, allowing four flash pictures to be taken without changing flashbulbs. The next innovation, the magicube, was introduced in 1970. The magicube resembled the flashcube but did not require batteries. However, the flashcube and the magicube suffered from a problem known as "red-eye," which produced red dots in the eyes of the photographer's subject. In 1972, Kodak contracted with General Electric Company to develop a new flash device that would eliminate "red-eye." The agreement forbade disclosure of the project's existence or progress to other lamp or camera manufacturers ("confidentiality agreement"). On April 10, 1975, Kodak and General Electric announced the new product, the flipflash, along with two compatible versions of the Kodak 110 amateur pocket camera. Flipflash moved the flash away from the lens center to eliminate "red-eye" and included a new method to ignite the flash lamp, the "piezo crystal system." Because the flipflash could not be used with cameras designed for the flashcube or magicube and because the confidentiality agreement ensured that Kodak's competitors would not begin to develop compatible cameras before the Kodak announcement, Kodak had no significant competition in flipflash cameras for several months after the announcement. Meanwhile, however, other companies had begun in 1974 to market a 110 camera with an internal flash. Interphoto and Kodak did not begin to sell such cameras until 1976 and 1978, respectively.

---

* Judge Friendly participated in the oral argument in this case and voted before his death on March 11, 1986, in favor of the disposition reached in this opinion.

The confidentiality agreement between Kodak and General Electric with regard to flipflash was the basis for the successful antitrust claim in *Berkey*. Berkey charged that, although Kodak did not make any meaningful contribution to the development of flipflash, the confidentiality agreement with General Electric prevented other camera makers from competing in the production of cameras compatible with flipflash. The jury found that the confidentiality agreement violated Section 1 of the Sherman Act. We affirmed. 603 F.2d at 304.

Plaintiffs filed the present action on August 27, 1979, two months after we decided *Berkey*. The complaint alleged numerous claims against Kodak, most of which have disappeared from the case. The parties have stipulated that "no recovery shall be had for any damages sustained prior to April 10, 1975," the date Kodak and General Electric announced the flipflash. Plaintiffs have also waived all claims against Kodak except those "for damages sustained by reason of the [Confidentiality] Agreement." Plaintiffs' claim, as now asserted, is thus based solely on the secrecy of the flipflash development.

Prior proceedings have also clarified Kodak's defenses. Judge Gagliardi, who was originally assigned to this case, held that Kodak was collaterally estopped to deny the violation of Section 1 of the Sherman Act. *Argus Inc. v. Eastman Kodak Co.*, 552 F.Supp. 589, 605 (S.D.N.Y.1982). No issue is taken with his ruling on this appeal. Kodak also abandoned its statute of limitations defense to the flipflash claim and entered into the stipulation regarding the damage period described *supra*.

The issues as narrowed are twofold. First, did the secrecy of the flipflash development cause the damages claimed by Argus and Interphoto? Second, do the plaintiffs have standing to raise this claim under applicable antitrust doctrine? After Kodak moved for summary judgment, Judge Pollack answered both questions in the negative. He found that neither plaintiff had shown, "by specific probative evidence, the existence of standing to sue or a proximate causal link between the violation and the alleged injuries." *Argus Inc. v. Eastman Kodak Co.*, 612 F.Supp. 904, 906 (S.D.N.Y. 1985). He also held that the damage claims were too speculative to support a recovery. *Id.* at 923. Plaintiffs appeal from this judgment. Because we agree with the district court that plaintiffs failed to present a triable issue of fact on the element of causation of the particular damages claimed, we do not reach the standing issue.

### 2. *Plaintiffs' Claim for Damages*

At all pertinent times, Interphoto, which was controlled by Argus, was a wholesale distributor of a wide range of photographic equipment, including a 110 magicube camera marketed under the "Argus" name. Argus licensed its trademark to Interphoto. Interphoto in turn purchased cameras and other photographic equipment, labeled them "Argus," and resold them to retailers. Interphoto paid Argus a 1.5% royalty on all Interphoto sales of "Argus" merchandise.

Plaintiffs' claim for damages posits the following scenario. Interphoto had built its business plan for 1975 around the promotion of the Argus 110 magicube camera as its "lead product." (The Argus 110 was to have replaced the Yashica 35 millimeter camera in this role.) A lead product, or "lead line," is a distinctive item of sufficient popularity to cause buyers, here retailers of camera equipment, to purchase both it and other more fungible products offered by the wholesaler. But for the lead line these latter sales would not be made. As a result of the introduction of Kodak's 110 flipflash camera, 110 cameras using magicube flash systems, such as the Argus 110, were made obsolete. Moreover, the secret development of the flipflash and compatible Kodak camera prevented Interphoto from offering a flipflash camera as a "lead line" until after the 1975 Christmas selling season. Interphoto thus lacked a popular lead line camera at a critical moment and suffered as a conse-

quence a decline in sales of its entire range of products. A downward spiral in Interphoto's business followed as customers, salesmen, suppliers, and creditors took their trade elsewhere. Interphoto was forced into "liquidation mode" and, in 1980, out of the wholesale photographic business.

Argus' claim is entirely derivative of Interphoto's claim, namely that the damage done to Interphoto's sales of the entire line of Argus-brand photo equipment deprived Argus of trademark royalties that it had expected to earn.

In March 1984, the parties entered into a stipulation that plaintiffs would supply "a form of pretrial order setting forth," *inter alia,* "a statement of factual contentions they intend to prove, including damages theories and contentions." Plaintiffs then provided estimates of what Interphoto's total sales, Interphoto's sales of Argus products, Interphoto's total and Argus-related profits, and Argus' royalties would have been absent the confidentiality agreement.[1] Because Interphoto did not specify a contention as to what portion of its total alleged lost profits reflected losses in sales of Argus 110 magicube cameras, the item in direct competition with the flipflash, it abandoned any claim of damages for loss of 110 sales alone. Similarly, lost profits from lost sales of other individual products of the line were not specified.

Plaintiffs' contentions as to damages thus consist solely of lost profits on sales of Interphoto's and Argus' entire line of products, resulting in their commercial demise. The only damage award a trier of fact could make on the basis of plaintiffs' contentions, therefore, is for that entire line, not for any lesser claim for lost profits on particular items in the line. Essentially,

therefore, we must thus decide whether Kodak's actions caused the destruction of plaintiffs' businesses.

### 3. *Discussion*

■ Causation in fact is, of course, a necessary element of any claim for relief under Section 4 of the Clayton Act, 15 U.S.C. § 15, which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor." Discussions of the causal nexus between economic injury and an antitrust violation may also implicate issues such as standing or proximate cause since not every party injured may assert an antitrust claim. *See, e.g., Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535–36 & n. 31, 103 S.Ct. 897, 907–08 & n. 31, 74 L.Ed.2d 723 (1983). However, lack of causation in fact is fatal to the merits of any antitrust claim. *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.,* 510 F.2d 1140, 1142 (2d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975). Consequently, an essential element in plaintiffs' claim is that the injuries alleged would not have occurred *but for* Kodak's antitrust violation.

The district court held that there was insufficient probative evidence of causation in fact to warrant submission to a trier of fact of plaintiffs' claims of lost profits on their entire lines and of the ultimate destruction of their businesses. 612 F.Supp. at 927. We review this decision in light of the familiar rule that Interphoto and Argus are "to be given the benefit of all reasonable doubts in determining whether a genuine issue of material fact exists." *Reading*

---

1. These projections were not pessimistic. Actual Interphoto sales for the fiscal year ended February 29, 1976, the year flipflash was introduced, were $24.5 million; plaintiffs estimated that in the absence of flipflash, Interphoto's sales for that year would have totalled $32.5 million, and sales would have increased to $136.8 million by the fiscal year ended February 28, 1985. Plaintiffs estimated that lost Interphoto profits in the fiscal year ending in February 1976 were $2,748,000. Estimates of Interphoto's

lost profits steadily rise to a total for fiscal year 1985 of $9,747,000. Interphoto's total lost profits during the ten years are said to be $53,478,000. Argus' lost royalties from Interphoto's sales of Argus-brand products were estimated at $88,000 for 1975, up to $666,000 by 1984, with a ten-year total of $3,450,000. Given the moribund financial circumstances of Interphoto and Argus when the flipflash was introduced, described *infra,* these estimates have an air of unreality.

*Industries v. Kennecott Copper Corp.,* 631 F.2d 10, 13 n. 6 (2d Cir.1980), *cert. denied,* 452 U.S. 916, 101 S.Ct. 3051, 69 L.Ed.2d 420 (1981). *See also United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Bailey v. Hartford Fire Insurance Co.,* 565 F.2d 826, 830 (2d Cir.1977). Of course, "mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion," *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985), and a party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* — U.S. —, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Moreover, "[w]hen the fact of injury is in issue, the 'isolated self-serving statements' of a plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely." *H & B Equipment Co. v. International Harvester Co.,* 577 F.2d 239, 247 (5th Cir.1978) (quoting *Yoder Bros., Inc. v. California-Florida Plant Corp.,* 537 F.2d 1347, 1371 & n. 25 (5th Cir.1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977)); *accord Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705, 714 (11th Cir.1984). Finally, the required showing is heightened when the "factual context renders [a] claim implausible." *Matsushita,* 106 S.Ct. at 1356. In such circumstances, "more persuasive evidence ... than would otherwise be necessary" must be adduced. *Id.*[2]

We have reviewed the record and have concluded that there is no genuine issue of fact with regard to whether the flipflash confidentiality agreement caused Interphoto's and Argus' commercial demise.[3] We begin our discussion of the evidence with the contemporaneous explanations proffered by Interphoto's management for the severe financial difficulties the company experienced. The failure of a business' management to note at the time what is later claimed by its lawyers to have been a mortal commercial wound weighs heavily against such a claim. *See Copy-Data Systems, Inc. v. Toshiba America, Inc.,* 755 F.2d 293, 300–01 (2d Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 80, 88 L.Ed.2d 66 (1985). It is thus a telling blow to plaintiffs' lead line, destruction of business theory that Interphoto's contemporaneous accounts of the reasons for its economic ailments consistently contradict its present position.

Interphoto's Annual Reports and Form 10-K's, including those for the fiscal year ending February 29, 1976, which included the ten months following the flipflash announcement, explained dismal sales and financial results without ever mentioning competition with the flipflash. These reports emphasized such factors as: "substantial operating losses in the non-photographic operations"; "the discontinuance effective February 28, 1975 of the distribu-

---

**2.** Judge Pollack ordered an evidentiary hearing on defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 43(e), which provides:

When a motion is based on facts not appearing of record the court may hear the matter on affidavits presented by the respective parties, but the court may direct that the matter be heard wholly or partly on oral testimony or deposition.

Rule 43(e) can be used to hear motions for summary judgment. *State of Utah v. Marsh,* 740 F.2d 799, 801 n. 2 (10th Cir.1984). *See also Argus,* 612 F.Supp. at 908 n. 2 (citing cases); 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure,* § 2723, at 61 (2d ed. 1983); *Burnham Chemical Co. v. Borax Consolidated Ltd.,* 170 F.2d 569, 573 (9th Cir.1948), *cert. denied,* 336 U.S. 924, 69 S.Ct. 655, 93 L.Ed. 1086 (1949). When the motion for summary judgment was made in the instant case, the record consisted of an enormous mass of documents, and the district court was well within its discretion to conclude that a hearing would allow the court to assess the record expeditiously and accurately.

**3.** Plaintiffs invoke *Klinger v. Baltimore and Ohio Railroad Co.,* 432 F.2d 506, 516 (2d Cir. 1970), for the proposition that a wrongdoer whose acts create uncertainty bears the burden of proof on causation as well as on the quantum of damages. Assuming this dictum is the law and that it applies in a case where the uncertainty is as much the result of the theory of damage selected by the plaintiffs as of the acts of the defendant, shifting the burden would not affect the outcome in the instant case.

tion of Yashica cameras, which had accounted for approximately $11 million of 1975 [March 1974 to February 1975] sales"; "the general depression in retail photographic sales"; and "late delivery of products imported from the Far East." On November 11, 1975, following the Christmas selling season so crucial to the plaintiffs' lead line theory (the wholesale Christmas season is of course earlier than the retail season), the president of Interphoto explained to its board of directors why sales were not "up to forecast." He never mentioned flipflash. Instead, he reported, "The only valid excuse we have is that we were not able to get our fall goods on time. [Letters of credit] were not available until late in August." The unavailability of letters of credit was due to credit restrictions imposed as a result of Interphoto's already precarious financial condition.

Interphoto's 1975 Annual Report (dated May 28, 1975) speculated: "Kodak has again introduced a new Pocket Camera that obsoletes existing Pocket Cameras and our inventory and suppliers of 110 Pocket Cameras are in jeopardy." However, that statement evidenced concern only about sales of 110 cameras, not about a devastating lead line effect. The next annual report, written when the flipflash's actual competitive effect was known, and after the alleged mortal wound administered, made no reference at all to flipflash.

Three years later, the 1979 Annual Report did, however, contain the following statement: "Ever since the Bell & Howell and Fotomat settlements with Kodak were completed and the Berkey and GAF suits were filed, we have been searching for the means of entering the antitrust fray. We believe that our case is better than the two settlers and the two litigators."

This "search" of course led to the instant litigation. The lead line theory was not advanced in the litigation, however, until it became tactically convenient. Thus, the lead line claim emerged only after a ruling by Judge Gagliardi made it clear that plaintiffs' only viable antitrust claim involved the flipflash confidentiality agreement and

that it was not time barred. Prior to that time, when there was a danger that the events of April 1975 might be time barred and other theories of liability seemed feasible, plaintiffs had contended that competitive injury from flipflash did not begin until after the innovation had gained "significant market acceptance," a date plaintiffs said was about a year after its introduction, or April 1976. This position is of course at odds with their present assertion that flipflash "mortally wounded" Interphoto in 1975. Brief of Appellants at 23.

Against this background of contemporaneous evidence inconsistent with present claims and of varying damage theories in this litigation, we turn to a more detailed examination of plaintiffs' present claim.

We begin with an overview of Interphoto's and Argus' financial condition. Interphoto's photographic distribution business had been in severe decline well before the announcement of flipflash in April 1975. In the three years ending February, 1975, it had total losses of over $7.2 million in photographic business and over $22 million overall. It had lost much of its share of the wholesale photographic market. Its share of the "gross national photo product" declined from 1.84% in 1965, to 0.88% in 1973, to 0.58% in 1974. Argus, by the time of the flipflash announcement, had reduced its photographic business to licensing its trademark to Interphoto.

During this time, Interphoto had difficulty maintaining suppliers. Yashica had provided Interphoto with sales of over $8 million in 35 millimeter and 110 camera sales in 1974, including 84.3% of Interphoto's 110 camera sales. Interphoto announced the termination of its exclusive distribution relationship with Yashica on January 1, 1975, and Yashica soon established its own United States distribution network. This caused a decline in Interphoto's sales of 35 millimeter cameras from $7,624,000 in 1974 to $1,224,500 in 1975. Interphoto's other suppliers of 35 millimeter and movie cameras, Cosina and Petri, also ceased to fill their previous roles. A supply agreement with Cosina, in effect since 1969, was can-

celled in early 1974. As described by Interphoto's president, the final discontinuation of Petri occurred on December 1, 1975, "after many months of difficulties." In September 1974, Interphoto also ceased doing business with Sedic, its sole other supplier of 110 cameras, because Sedic was in financial difficulty. In addition, plans for Argus to cooperate in manufacturing a pocket camera with the Maurer Commercial Products Corporation collapsed by the end of 1974.

At the time of the flipflash announcement, therefore, Interphoto had no supplier of 110 cameras and had ordered no such cameras for over six months. Interphoto also had lost its supplier of its then lead line product, the Yashica 35 millimeter cameras. Moreover, the total number of suppliers represented by Interphoto fell from 100 to 50 in the year ending February 28, 1975. At that time, Interphoto had merged its two sales divisions into one, closed three of its seven warehouses, and reduced its sales force from 125 to 60.

Whereas in 1970 Interphoto borrowed at the prime rate without need of security, by the end of 1974 it had to resort to paying 6% over the prime rate and to pledging all its assets as well. Moreover, the expected future returns from Interphoto's business were not highly valued by those in the best position to know. Several months prior to the flipflash announcement, in response to the financial difficulties of the principal Argus shareholder, Michele Sindona, various officers and employees of Argus agreed to purchase 64% of Argus' outstanding common stock for $400,000. Because Argus at that time owned 80% of Interphoto, the combined value of the two companies shortly before the flipflash announcement was thus in all likelihood less than $1 million, hardly candidates for the robust economic future ($2.7 million in profits for Interphoto in that fiscal year) depicted in plaintiffs' damage estimates. *See* note 1, *supra*.

When the flipflash announcement was made, Interphoto and Argus were wallowing in deep financial trouble, were steadily contracting their businesses, had lost their lead line product, the Yashica 35 millimeter camera, and lacked even a supplier for their projected new lead product, the Argus 110. The implausibility of the claim that but for the flipflash announcement, Interphoto would have earned $2.7 million in the fiscal year ending February 1976 seems self-evident.

Moreover, the destructive role attributed to the flipflash by plaintiffs greatly exaggerates its marketing power. Kodak's sales of 110 cameras actually declined from 4,168,000 units in 1974 (pre-flipflash), to 4,077,000 in 1975 (post-flipflash), to 3,238,000 in 1976. Kodak's share of the amateur still camera market declined from 75% in 1974, to 70% in 1975, to 59% in 1976. The reason for this decline was that consumers generally preferred the new internal flash cameras over both the flipflash and the magicube. For instance, Vivitar entered the 110 market with its internal flash cameras in 1974, and by 1976 was the second largest seller of 110 cameras.

Plaintiffs ignore the popularity of the internal flash in asserting that the 110 magicube would have been a powerful lead product but for the flipflash. When flipflash cameras were out of stock during the 1975 selling season, retailers chose to buy 110 internal flash cameras over 110 magicube cameras, concrete evidence that the latter was not "obsoleted" solely by the flipflash. Indeed, when Interphoto began to sell both internal flash and flipflash cameras in 1976, its internal flash sales exceeded its flipflash sales. Moreover, the number of 110 magicube cameras sold by Interphoto was greater in 1975 than in 1974, although the dollar value of 110 sales declined.[4] The truly sharp decline was in Interphoto's sales of 35 millimeter cameras, from $7.6 million to $1.2 million over the same period.

---

**4.** Total sales of 110's by Interphoto *and* Argus declined somewhat from 1974 to 1975. However, Argus sold some 110's in 1974 through wholesalers other than Interphoto. In 1975, all of Argus' 110 sales were through Interphoto.

Argus' and Interphoto's causality claims are thus thoroughly implausible and cannot survive a motion for summary judgment absent persuasive evidence rebutting the facts discussed *supra.* *See Matsushita,* 106 S.Ct. at 1355. Such evidence has not been forthcoming.[5] The testimony in support of the lead line theory consists largely of conclusory statements by plaintiffs' officers and employees. *See H & B Equipment Co.,* 577 F.2d at 247. For example, one such witness testified that "a new development was announced [in April 1975] which basically obsoleted Argus' line of cameras" and "made Interphoto ... a secondary source and would have reduced or did reduce the sales dramatically, and the salesman's ability to sell." Similarly, another testified that during the 1975 Christmas selling season, his sales people reported:

Panic. They—we were in the middle of a season without a lead line at that point already, without something that was updated, or—well, which constituted our lead line of 110's—we had told them during our sales meeting that we would have a full line of 110's with our own product development

. . . .

And therefore when this hit, then the phone calls that kept coming into me in say August and September were that of

panic and asking where was this camera that I spoke to them about, that we told them about, period.

Such testimony, unsupported by documentary or other concrete evidence of the supposed lead line effect, is simply not enough to create a genuine issue of fact in light of the evidence to the contrary. The lead line that had been lost was the Yashica 35 millimeter. Orders for the 110 were placed only after the flipflash announcement, and the "panic" in the August/September 1975 Christmas season was attributed at the time by Interphoto's president to the failure to acquire 110's in time because of credit difficulties, in his words, "[t]he only valid excuse." Finally, the relative popularity of internal flash cameras is ignored. This conclusory testimony falls woefully short of that necessary to outweigh the volume of contrary facts in the record.

Plaintiffs also offered the testimony of buyers for retailers who did business with Interphoto in 1975. Their testimony adds little in the way of rebuttal. One buyer testified that Interphoto sales to his company, including items other than 110 cameras, would have been higher in 1975 if Interphoto had offered a flipflash camera. However, these other items were "a camera case, a strap, things like that to go along with the camera," hardly evidence of an effect on the entire line of Interphoto prod-

**5.** Plaintiffs contend that various cases, most notably *Spray-Rite Service Corp. v. Monsanto Co.,* 684 F.2d 1226, 1242 (7th Cir.1982), *aff'd,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), require us to give credence to their lead line theory of causation. These cases, they claim, stand for the proposition that "an antitrust plaintiff is entitled to recover the total losses of an entire business or division and the loss of profits it would have earned from all products and operations of that business or division but for its termination where an injury caused to one or more products and operations by the defendant's antitrust violation forced such termination." Appellants' Brief at 36. Plaintiffs add: "A distributor who loses 'follow-on' sales based upon lack of a significant product because of a wrongful termination of a distribution arrangement is in the same position as one who loses 'follow-on' sales based upon loss of economic viability of a significant product caused by a secrecy conspiracy." *Id.* at 62 n. 154.

We may readily agree that these cases permit recovery of damages on a lead line theory. They do not, however, dispense with the requirement that the evidence support such a recovery. Each of the cases mentioned involved a much more direct evidentiary connection between the lead line product and the asserted loss of sales of an entire line than in the present case. For example, in many of these cases, suppliers terminated a distributor's right to sell a well-known, branded product with, as the district court noted, a "documented 'door opener' effect." 612 F.Supp. at 920. *See Spray-Rite,* 684 F.2d at 1241–42; *Greene v. General Foods Corp.,* 517 F.2d 635, 663–64 (5th Cir.1975), *cert. denied,* 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976); *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.,* 447 F.Supp. 867, 878 (S.D.N.Y.1978), *rev'd on other grounds,* 602 F.2d 1025 (2d Cir.), *cert. denied,* 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979); *Interphoto Corp. v. Minolta Corp.,* 295 F.Supp. 711, 723–24 (S.D.N.Y.), *aff'd,* 417 F.2d 621 (2d Cir.1969).

ucts. Moreover, when he was asked about the impact of a "lead line product" on purchases of other products, he responded, "If you did not want to buy the salesman's number one item, I felt you would not buy or have a tendency not to buy the rest of the items in the line either." He was then asked, "Did that actually happen in 1975 so far as Interphoto was concerned?" He answered, "No. Not actually."

Another retailer was asked whether he reduced his 1975 purchases of any Interphoto product besides the Argus 110 magicube camera. He responded, "Yes, I did ... Because I relied on Interphoto to be my first line next to Kodak and I suddenly wasn't getting what I needed and just turned to other distributors who I was only dealing in a smaller way with and I just opened the door to buy more products from them." This testimony fails to link the claimed dramatic collapse of Interphoto's entire product line to the competitive weakness of the Argus 110 or to link that competitive weakness to the flipflash rather than internal flash cameras. In fact, that retailer had never purchased Argus cameras prior to the introduction of the flipflash. Moreover, Interphoto sales records show that he purchased a wide variety of Interphoto products both before and after the announcement of flipflash. His testimony further indicates that the business lost by Interphoto went to other distributors who also lacked a flipflash camera.

Finally, we briefly address the testimony and submissions of plaintiffs' expert. He concluded that

> in 1975, Interphoto had a lead line product which had been obsoleted and was no longer marketable. This is precisely the type of "dramatic lead line product unavailability" referred to above, which can be traumatic to a company. There is no question in my judgment that this circumstance caused substantial damage to Interphoto and which damage has continued to date.

The district court properly found this naked conclusion to be unsupported and thus inadequate to rebut the volume of

evidence to the contrary. *See Chrysler Credit Corp. v. J. Truett Payne Co.*, 670 F.2d 575, 581 (5th Cir.), *cert. denied*, 459 U.S. 908, 103 S.Ct. 212, 74 L.Ed.2d 169 (1982).

We affirm the grant of summary judgment. We do not rule on the Rule 11, Fed.R.Civ.P., issues because they are not before us in judgment form.