**RYDER ENERGY DISTRIBUTION CORPORATION, Plaintiff,**

v.

**MERRILL LYNCH COMMODITIES, INC., Defendant.**

**No. 82 Civ. 6688 (CSH).**

United States District Court, S.D. New York.

March 28, 1988.

---

Newman Tannenbaum Helpern Syracuse & Hirschtritt, New York City, for plaintiff; Richard A. Miller, Vincent J. Syracuse, of counsel.

Roger & Wells, Washington, D.C., for defendant; Roger A. Clark, Stuart M. Goldberg, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Defendant Merrill Lynch Commodities, Inc. ("Merrill") moves for summary judgment pursuant to Rule 56, F.R.Civ.P.

In March 1982 plaintiff Ryder Energy Distribution Corporation ("REDCO") paid $3,471,300 to Two Oil, Inc. ("TOI") for 87,-000 barrels of heating oil to be delivered in May. TOI failed to deliver the oil. REDCO never recovered the purchase price. Thus aggrieved, REDCO commenced this action against Merrill, the New York Mercantile Exchange, and E.F. Hutton & Co., Inc., alleging various causes of action related to the transaction.

In an unreported decision, this Court dismissed the entire complaint pursuant to Rule 12(b)(6). REDCO appealed only as to the Exchange and Merrill. The Second Circuit affirmed the dismissal of the complaint with respect to the Exchange, and reversed and remanded with respect to Merrill. 748 F.2d 774 (2d Cir.1984). After extensive discovery, Merrill makes the present motion.

The facts and circumstances of this transaction are comprehensively stated by Judge Meskill in his opinion for the court of appeals. Familiarity with that opinion is assumed. I come directly to the merits of Merrill's summary judgment motion.

Merrill contends it is entitled to summary judgment for three reasons. First, Merrill processed the EFP in suit in accordance with what REDCO knew was accepted industry practice. Second, REDCO did not rely on Merrill in entering into the EFP with TOI, and, in consequence, Merrill did not cause REDCO's loss. Third, REDCO's prior relationship with TOI and its communications to Merrill concerning TOI and the transaction in suit estop REDCO from claiming against Merrill.

These three points of defense overlap to some degree. In the view I take of the case, I need give detailed consideration only to the second, which focuses on causation: that indispensable link between a defendant's conduct and a plaintiff's injury.

I begin the analysis with Judge Meskill's prescient observation that on remand, "the district court will likely confront questions of estoppel and causation." 748 F.2d at 782. In footnote 6, dropped from the text at that point, the Second Circuit continued:

"In advancing its lack of causation claim, Merrill refers to a number of facts, that appear outside the complaint, in particular, a deposition which shows that REDCO knew TOI had no oil before the EFP was conducted. While we agree with Merrill that these facts particularly the

deposition, raise issues of causation and estoppel, a 12(b)(6) motion is not the proper mechanism to resolve those issues."

These words pose the causation issue neatly. The causation issue in the case at bar is whether REDCO's loss would have been prevented if Merrill had performed the duty the court of appeals says Merrill owed to REDCO: "simply ... to ask TOI if it had 87,000 barrels of oil" before issuing its certificate "that TOI owned and had possession of the 87,000 barrels of oil necessary to cover the contract." 748 F.2d at 782.

Merrill casts its causation argument in terms of non-reliance, and calls particular attention to *Bennett v. United States Trust Co. of New York,* 770 F.2d 308 (2d Cir.1985). But *Bennett* proceeds from a different posture.

*Bennett* was a securities fraud case. "Reliance" is that particular sub-species of causation indigenous to cases of fraudulent misrepresentation. Plaintiffs in *Bennett* alleged that the defendant trust company fraudulently misrepresented to them that public utility stocks could be pledged as loan collateral without regard to margin rules. Plaintiffs thereupon borrowed funds from defendant, purchased such stocks, and pledged them as collateral for the loan. The stock declined and defendant liquidated plaintiff's account at a loss because it was under-margined (thereby applying to these securities those margin rules which defendant had misrepresented to plaintiffs did not apply).

The Second Circuit affirmed dismissal of the complaint on motion. It rejected plaintiffs' causation theory that "but for" defendant's misrepresentation and resulting loan, they would not have bought the stock. That sequence established, the court of appeals reasoned, no more than "loss causation", which in the absence of "transaction causation" is insufficient to support a claim for fraudulent misrepresentation. Transaction causation requires proof "that the violations in question caused the [plaintiffs] to engage in the transaction in question." 770 F.2d at 313, citing and quoting *Schlick*

*v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 380 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

There are obvious differences between *Bennett* and the case at bar. In *Bennett,* the defendant's fraudulent misrepresentation preceded the securities transaction which ultimately caused plaintiff's economic loss. In the case at bar, REDCO and TOI had negotiated the terms of the 87,000 barrel sale from TOI to REDCO, including the prepayment condition, before REDCO told Merrill anything about the transaction, and so, by definition, before Merrill performed any relevant act of omission or commission. And Merrill's alleged fault, although taking the outward form of a certification under the Exchange rules, proceeds primarily from its failure to discharge that duty the Second Circuit derived from the complaint and the Exchange rules: to inquire as to ownership and possession of the oil before certifying the transaction. That is to say, we deal at bar not so much with fraudulent misrepresentation as with the failure to perform a contractual or quasi-contractual duty.

Within the causation context, Merrill also relies on *Argus Inc. v. Eastman Kodack Co.,* 801 F.2d 38 (2d Cir.1986). The causation issue in *Argus,* an anti-trust case, was whether the failure of plaintiff's business "would not have occurred *but for* Kodack's anti-trust violation", 801 F.2d at 41, which had taken place prior in time. The Second Circuit affirmed the district court's conclusion, in a grant of summary judgment to defendant, that this causal connection had not been shown, and could not be shown at trial.

The case at bar turns upon the issue whether REDCO's loss, incurred in May 1982 by TOI's failure to deliver the oil and REDCO's inability to recover the prepaid purchase price, was caused by anything Merrill did or failed to do.

It is useful first to consider the prevailing standards for the granting or withholding of summary judgment. Whatever misperceptions practitioners in this circuit may have held about the availability of summa-

ry judgment in appropriate cases, Chief Judge Feinberg laid them to rest in *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 12 (2d Cir.1986) *cert. denied,* —— U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). Much of the current climate derives from recent Supreme Court decisions. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Court focused upon "whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." 106 S.Ct. at 2511. That is a standard, the Court continued, which "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Ibid.* The analogy is particularly appropriate to the case at bar, where extensive pre-trial discovery has generated the testimony of every witness, and the production of every document, that one could reasonably expect to encounter at trial. Accordingly, the inquiry is that posed by *Anderson:* "Whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 2512. *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed. 2d 265 (1986) (Rule 56 is intended to implement the rights of litigants to demonstrate prior to trial that claims "have no factual basis").

In *Argus, supra,* the Second Circuit cited a third Supreme Court case, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and other cases in laying down general principles governing summary judgment. The party resisting summary judgment is to be given the benefit of all reasonable doubts in determining whether a genuine issue of material fact exists. However, mere conjecture or speculation by the resisting party does not provide a basis upon which to deny the motion; and that party must do more than simply show that there is some metaphysical doubt as to the material facts. Nor, when the fact of injury is an issue, may the isolated self-serving statements of a plaintiff's corporate officers be regarded as substantial evidence upon which a jury could rely. Finally, the moving party's showing is heightened when the factual context renders the opposing party's claim implausible. In those circumstances, more persuasive evidence than would otherwise be necessary must be adduced to avoid summary judgment. *Argus,* at 801 F.2d 41–42, and cases cited.

REDCO's theory of causation is that if Merrill, after being advised by REDCO of the latter's negotiated contract with TOI, had asked TOI if TOI then owned and physically possessed the 87,000 barrels to be delivered under the contract in May, TOI would have said "no"; and that, if Merrill had conveyed that information to REDCO, REDCO would not have sent TOI its prepayment. REDCO bears the burden of proof on the plausibility of that scenario.

Ownership *and* physical possession at the time of contracting are both crucial to REDCO's theory of causation, given the Second Circuit's formulation of the duty Merrill owed to REDCO: "to certify that TOI owned and had possession of the 87,-000 barrels of oil necessary to cover the contract." REDCO professes its perception of an EFP as a means by which it "could obtain the actual, wet, diesel fuel it needed to run its trucks." Redco brief at 29. REDCO's causation theory, in essence, is that Merrill failed its duty to ascertain that TOI has such stuff in its physical possession when the contract was executed.

The analysis begins with prior dealings between REDCO and TOI. The contract in suit was not their first transaction. Earlier transactions are probative of what REDCO knew in March 1982 TOI was, and what it was not.

REDCO and TOI first encountered each other when Ofelia Alvarado, a REDCO employee responsible for dealings with the company's futures brokers, and another REDCO employee met Barry Bryson, TOI's

principal trader, at a cocktail party in Tulsa in April, 1981. The party was hosted by the Williams Pipeline Company. Willaims had an annual oil shippers meeting. The REDCO representatives attended because: "We were new shippers, and we wanted to become familiar how the pipeline worked."[1] Shortly thereafter, Alvarado asked Bryson if "he had diesel fuel available for sale in the Williams Pipeline."[2] Bryson responded in the affirmative, and REDCO purchased 25,000 barrels from TOI in April 1981. In July 1981 REDCO purchased another 25,000 barrels from TOI, for delivery several weeks later. These contracted-for quantities were ultimately delivered to REDCO. The documents generated by each transaction reflected that the oil REDCO purchased from TOI was delivered by other oil companies, presumably in fulfillment of their separate commitments to TOI.[3]

After those transactions Russell Pfaff, who was in charge of REDCO's operations, and two other REDCO representatives visited Houston "to meet with several suppliers and perspective suppliers."[4] Pfaff and his colleagues visited the TOI offices. Pfaff described the TOI offices as "modest, but certainly, representative of the type of operation", by which he meant a "trading house." Pfaff described his understanding of what TOI did as a trading house: "Traders typically buy product in the marketplace, sell it to users, become involved in exchanges of product, and run a going petroleum business."[5]

In February 1982 REDCO added a new dimension in its dealings with TOI. REDCO had periodic needs for oil in various locations. To avoid storage costs, REDCO established with TOI an arrangement known as a "convenience exchange." Under a convenience exchange, one company delivers oil to a second company at one place along a pipeline, and receives oil back along the line at a later date. The conve-nience of this sort of exchange lies in the avoidance of storage fees. As things worked out, REDCO would deliver oil to TOI at one location; subsequently TOI would deliver oil in conformity with REDCO's needs to another company (in actual fact, Union Oil Company and Total Oil Company); and those companies, pursuant to agreements between them and TOI, would deliver the oil to REDCO from their facilities along the pipeline at locations desired by REDCO. Consistent with the nature and purpose of a convenience exchange, there was a time gap between delivery of oil by REDCO to TOI and redelivery of oil, at a different location, back to REDCO.[6] Consistent with TOI's operations as a commodity trader, TOI sought to make a profit from its control of the oil during the interim. REDCO was well aware of such activities by TOI, as the following testimony given by Alvarado during a 1982 deposition in TOI's bankruptcy proceeding makes clear:

"We had one particular situation that we had to attend to in February, which was a delivery that we were getting that we had nothing, no place to put that delivery.

So Barry said that they could take it and deliver it back to us at March as soon as they worked out the details of the exchanges with one of the major oil companies.

Q. What did you tell him when he told you that?

A. I said, 'Well, where are you, what are you going to do with the product between February and March.'

Q. What did he say?

A. He said that he could make some money with it.

Q. What did you say?

A. And I said, well, as long as we will get the product delivered to the major oil company and that we can get the product

---

1. Alvarado 1985 deposition at Tr. 55.

2. *Id.* at 71–72.

3. *Id.* at 47–8, 71–73, 76–77, 230.

4. Pfaff deposition at Tr. 38.

5. *Id.* at 38–39.

6. The purpose and structuring of a convenience exchange are described in the Alvarado 1985 deposition at Tr. 850.

accessed in March, that I would have no problem with him trying to make some money.

Q. What did he say?

A. That he would take that product and enter an agreement with someone who would give it back to him in March so that we would have it, that he would have it available to give back to me.

Q. What did you say?

A. I said that was fine as long as I would get it back in March.

Q. Was that the end of your conversation?

A. No. Once he was able to find out who he was going to do the transaction with, he told me that he had made a purchase and sale to E–Z SERvice.

He had made a sale in February and a purchase in March, and that when he got the purchase in March, he would then provide that product through one of the exchanges to Ryder." Tr. 64–66.

Dealings between REDCO and TOI in February and March 1982 left TOI with obligations to deliver more than 3 million gallons of oil to REDCO at future times.

Meanwhile, REDCO's position on the fuel oil futures market was deteriorating as the result of dropping oil prices. As Judge Meskill noted for the court of appeals, in March 1982 "REDCO was long 87 futures contracts" traded on the exchange, "covering 87,000 barrels of No. 2 heating oil." 748 F.2d at 778. REDCO entered into the contract in suit with TOI because, again in Judge Meskill's words, REDCO was "[d]etermined to extinguish its obligation under these contracts", *ibid.* Indeed, in February REDCO had asked its brokers, including Merrill, to locate an EFP partner for the 87 long futures contracts. Alvarado was in a hurry. She testified:

"I told several people that I wanted to do this as soon as possible. In fact, I started to have all my brokers look for EFP partners in February because of the deteriorating market. I told everyone that was looking for EFP partners that I

wanted to effect an EFP as soon as possible." 1985 Deposition at Tr. 719–20.

The brokers could not locate an EFP. Alvarado then turned to Barry Bryson at TOI. Bryson was unfamiliar with EFP's. Alvarado undertook to explain an EFP to Bryson. Her telephone conversations with Bryson began on March 9 or March 10.[7] Alvarado described her explanatory conversation with Bryson as follows:

"Q. Did Bryson know what you were talking about when you said EFP?

A. I explained to him with the EFP was, yes.

Q. What did you tell him.

A. I told him that in exchange of futures for physical was a transaction on the New York Merc whereby the positions on the Merc are offset and then a position is established on the cash market for an equivalent amount of gallons.

Q. Now, did you tell him it happened in that sequence?

A. I didn't explain all of the mechanics of it because what I basically told him was to be able to do an EFP, you had to have so many gallons in the cash market and then so many positions in the futures market, but I didn't give him a sequence or anything." Alvarado 1985 deposition at Tr. 918–19.

When Bryson telephoned Alvarado back to tell her he could "do the deal", Alvarado advised Bryson he would need a futures broker. She referred him to William Knochel of Merrill. Thus the stage was set for Merrill to act as TOI's FCM in the transaction in suit.

In a 1983 deposition Bryson gave in the TOI bankruptcy proceeding, he recalled these conversations with Alvarado:

"Q. In your conversations with Ofelia concerning the—Do you recall this transaction involved 87,000 barrels?

A. I do recall that.

Q. In your conversation with Ofelia about the proposed transaction, what did she tell you, anything, other than it would involve Two Oil taking a short

7. Alvarado 1985 deposition at Tr. 850.

position for 87,000 barrels on the New York Merc?

A. I don't know. Ask me a specific question.

Q. Well, the transaction involving the 87,000 barrels, did it include both actions to be taken on the New York Merc as well as a contract between Two Oil and REDCO after the Merc transaction had been completed?

A. Yes, it did, and it also required that Two Oil buy product on the cash market in order to feed that purchase, if I recall.

MR. McDANIEL: Couldn't hear that. In order to what?

THE WITNESS: In order to feed that product.

Q. Did you have any conversation with Ofelia on or before March 15, '82, about such requirement of Two Oil acquiring a position on the cash market to feed 87,000 barrel contract?

A. Sure.

Q. And what transpired? What happened? What was said in that conversation?

A. Well, Two Oil was to—I don't recall the specific mechanics of the contract of the transaction, but it was necessary for Two Oil, Incorporated, ultimately to purchase barrels in the cash market, 75,000 barrels from outside purchasers and 12,000 barrels from Ryder to balance out the 87,000, so as to be able to deliver back exchange barrels to Ryder Energy.

Q. Did you have a conversation with Ofelia describing this necessity on or before March 15, '82?

A. I'm relatively sure I did.

Q. Did Two Oil have in its physical possession on March 15, '82, 87,000 barrels of No. 2 fuel oil?

A. Two Oil had contracts to purchase 87,000 barrels of No. 2 fuel oil.

Q. Did it have in its possession, physical possession that number of barrels of March 15, '82.

A. No.

Q. In your telephone conversation with Ofelia, on or about March 15, '82, did you say anything about the fact that Two Oil

did not have in its possession 87,000 barrels at that time?

A. I'm sure I did.

Q. If you told her on or about March 15, '82, that Two Oil did not have physical possession of 87,000 barrels, what else did you tell her about what Two Oil would do to attempt to obtain that number of barrels?

A. I'm sure I told her that Two Oil would buy the barrels on the cash market, 75,000, which was an even number of barrels and then it would be necessary for Two Oil to buy 12,000 barrels back from Ryder to add up to 87,000 barrels.

Q. Did you tell Ofelia on or before March 15, '82, that Two Oil had already contracted to purchase 75,000 barrels from some third party?

A. I don't know.

Q. Had it done so, to your recollection?

A. I think so, but I don't know for sure.

* * * * * *

Q. In your conversations with Ofelia on or before March 15, 1982, did you tell her or did she ask anything about Two Oil having physical possession of 87,000 barrels?

A. No, sir. I think she knew that Two Oil was buying barrels in the case market in May.

Q. What causes you to believe that she knew that?

A. I suspect that I told her that.

Q. Do you have a recollection of telling her that?

A. No, I don't.

(Conference between the witness and Mr. Tarpley.)

A. In response to your question, Mr. Wallace, It had to be obvious that Miss Alvarado knew that we were buying barrels in the future, because she knew that we had to buy 12,000 of the 87,000 barrels from her in order to complete the transaction.

Q. Aside from the 12,000 barrels of the 87,000, do you have a recollection of whether you told Miss Alvarado anything about having to acquire 75,000 barrels in the future in order to meet the obli-

gation, full obligation to deliver 87,000 barrels?

A. Yes, sir.

Q. Did you tell her that on or before March 15, '82?

A. I'm sure I did.

Q. Did you tell her how Two Oil intended to acquire those 75,000 barrels, from whom they intended to acquire them?

A. I don't recall if I told her from whom, but I did tell her that we had acquired them or were acquiring.

Q. Did you tell her how you intend to acquire them?

A. By purchasing them and I'm sure I told her that." Tr. 93–95, 111–13.

In a deposition taken by defendant in 1985, Bryson testified:

"Q. Did Ofelia Alvarado tell you she was under the impression that Two Oil had the barrels in its possession on March 15, 1982?

A. Mr. Miller, I would be very surprised if Ofelia believed that." Merrill Ex. C.

It will now be useful to examine in detail the chronology of the transaction in suit. The account which follows is drawn from those portions of Merrill's statement of undisputed facts which REDCO does not challenge.[8]

On March 12, REDCO and TOI reached agreement that REDCO would purchase 3,654,000 gallons (87,000 barrels) from TOI for $.95 a gallon. The parties also agreed TOI would book transfer[9] the product to REDCO on March 15 and REDCO would simultaneously book transfer that oil back to TOI on the convenience exchange for redelivery to REDCO at a later date.

Later on Friday, March 12, or Monday morning, March 15, Alvarado called Knochel, the broker which whom she dealt at Merrill, and said she had located and come to terms with TOI as an EFP partner. Alvarado indicated that she wanted to do the EFP as soon as possible. She stated that Bryson should contact Knochel and suggested that Merrill act as FCM for TOI as well as for REDCO.

Alvarado told Knochel, who was unfamiliar with TOI, that REDCO had met TOI in 1981, that REDCO had made fuel purchases from TOI and that REDCO had exchange agreements with TOI.

Shortly thereafter, Knochel spoke with Bryson. Knochel explained how the EFP would be handled and confirmed from Bryson the terms of the agreement between TOI and REDCO. After discussing the matter with his manager, Knochel placed an order for TOI for 87 short futures contracts in the months mirroring the REDCO long positions.

In a second conversation, Knochel reported the execution prices and the approximate amount of the over $800,000 loss TOI would have to pay to the Exchange when the futures positions were offset.

Knochel also told Bryson that TOI would have to confirm payment for the oil when it was received from REDCO.

Alvarado, who negotiated the EFP price with TOI, followed spot as well as futures oil prices. The net price paid to TOI by REDCO in the EFP (that is, after deducting the loss TOI had to pay to the Exchange when its short position was closed out), was between $.70–72 per gallon.

On March 15, the price of oil for delivery in May was about $.70 per gallon; however, the price of oil for immediate delivery on March 15 was $.80 per gallon.

At Knochel's request, Alvarado sent to him a copy of the contract between REDCO and TOI. That contract called for delivery of the oil on March 15 by book transfer, "Two Oil–Ryder–Two Oil", and payment by Ryder on March 16 after it had received the oil in this fashion. "Two Oil to Ryder" meant that TOI was delivering the EFP oil to REDCO; "Ryder to Two Oil" meant REDCO had transferred that oil back into the convenience exchange for later deliver back to REDCO.

---

8. Merrill's Rule 3(g) statement, ¶¶ 26, 28, 29, 30, 31, 33, 38, 39, 41, 42, 43.

9. The court of appeals defined a "book transfer" at 748 F.2d 778 n. 2:

"A 'book transfer' is simply an entry on the books of the seller transferring ownership to the buyer. It is an acceptable form of delivery under a No. 2 heating oil-New York Harbor contract. NYME Rule 150.04(a)(3)."

The contract, which Knochel had requested from REDCO as confirmation that REDCO had received the product, was telecopied by Alvarado to Knochel either during the afternoon of March 15 or the morning of March 16. Alvarado also sent to Knochel a copy of the invoice from TOI to REDO.

On March 16 REDCO paid TOI $3,471,000 for the 3,654,000 gallons of oil in accordance with the terms of the contract.

 On this record, I conclude that no reasonable jury could find a causal connection between Merrill's failure to inquire of TOI and REDCO's loss. I say that even though, as the evidence also shows, Knochel of Merrill did not ask TOI if it owned and physically possessed the quantities covered by the March 15 contract and indeed was unaware of the Exchange rule from which the court of appeals derived his duty of inquiry. These latter considerations relate to Merrill's breach of duty as perceived by the court of appeals; but fault unrelated by casual connection to injury is without legal significance. Causation is missing in this case because, at the time REDCO determined to enter into this contract with TOI, REDCO had a degree of knowledge approaching certainty that TOI did not at the time of contracting have physical possession of the quantity of oil covered by the contract.

The evidence of prior dealings demonstrates that REDCO knew TOI was an oil trader seeking profits by dealing in a volatile commodities market. REDCO also knew that TOI was not a fully integrated oil company. TOI drilled not, neither did it refine; neither did it own storage facilities. All this REDCO knew when it entered into the contract in suit with TOI, and subsequently advised Merrill of the contracts terms and conditions. Merrill, in contrast, had never heard of TOI before.

All REDCO's prior dealings with TOI are consistent with TOI's status as a commodities trader, invariably controlling oil futures by pieces of paper, seldom if ever keeping physical possession of oil for any period of time.

There is nothing in the transaction in suit inconsistent with that status. Indeed, Bryson's exchanges with Alvarado negate any perception or understanding on REDCO's part that TOI physically possessed the 87,000 gallons at the time the March 15 contract was agreed: quite the contrary. Bryson's testimony is persuasive because he is a disinterested witness.

REDCO's brief and affidavits recount at length Merrill's initiation of REDCO into the mysteries of an EFP. That account is intended to reinforce the conclusory assertions of REDCO's officers that they expected Merrill to confirm physical possession in TOI before REDCO made its contractual prepayment, or that Merrill would "guarantee" TOI's performance in the event of default, i.e., either deliver the May oil itself or reimburse REDCO's prepayment. But whatever general understandings REDCO may have derived from Merrill about an EFP, they cannot control the specific circumstances of this contract. Given those particular circumstances, the conclusory assertions of reliance and causation voiced by REDCO's officers are inherently implausible.[10]

### CONCLUSION

Defendant's motion for summary judgment is granted. The Clerk of the Court is directed to enter judgement in favor of defendant and against plaintiff dismissing the complaint with prejudice. Defendant may recover its statutory costs in an amount to be taxed by the Clerk.

It is SO ORDERED.

---

**10.** This resolution of the causation issue makes it unnecessary for me to consider an alternative contention Merrill makes, which is disputed and argued at length in the briefs. In short, Merrill contends that under established Exchange practice known to REDCO, the "Two Oil to Ryder to Two Oil" conveyances made known by REDCO to Merrill, constituted a sufficient factual basis for Merrill's certification under the Exchange rule in respect of TOI's ownership and possession of the oil covered by the contract.